1   SNYDER ♦ DORENFELD, LLP
    David K. Dorenfeld, (State Bar No. 145056)
2   Michael W. Brown, (State Bar No. 205380)
    5010 Chesebro Road
3   Agoura Hills, CA 91301
    Telephone: (818) 865-4000
4   Facsimile: (818) 865-4010

5   CATHY JACKSON LERMAN, PA
    Cathy J. Lerman
6   7857 W. Sample Rd., Suite 140
    Coral Springs, FL 33065
7   Telephone: (954) 663-5818
    Facsimile: (954) 341-3568
8
    BURSOR & FISHER, P.A.
9   L. Timothy Fisher (State Bar No. 191626)
    1990 North California Blvd., Suite 940
10  Walnut Creek, CA 94596
    Telephone: (925) 300-4455
11  Facsimile: (925) 407-2700
    Email: ltfisher@bursor.com
12
    Attorneys for Plaintiffs
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
    LIBERTY CITY CHURCH OF CHRIST,          )   Case No.: C12-4392
16  INC., MARY DINISH, KAUISHA SMITH,       )
    LARRY RUCKS and ROBERT BURKE,           )   CLASS ACTION COMPLAINT
17  individually and on behalf of a class of )
    similarly situated persons,              )   JURY TRIAL DEMANDED
18                                          )
                    Plaintiffs,              )
19                                          )
    v.                                       )
20                                          )
    EPHREN TAYLOR, EPHREN TAYLOR,           )
21  SENIOR, MESHELLE TAYLOR, CITY            )
    CAPITAL CORPORATION, ERX ENERGY,         )
    LLC, EQUITY TRUST COMPANY,               )
22  ROBERT BATT, ALAN LIPINSKI and           )
    DONALD M. MACINTYRE and DOES 1-15,       )
23                                          )
                    Defendants.              )
24                                          )
                                            )
25                                          )
                                            )
26                                          )
                                            )
27                                          )
                                            )
28  _____ )

    CLASS ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

Plaintiffs, LIBERTY CITY CHURCH OF CHRIST, INC., MARY DINISH, KAUISHA SMITH, LARRY RUCKS, and ROBERT BURKE ("Plaintiffs"), individually and on behalf of a class of similarly situated entities and/or persons, respectively, bring this action, by and through their undersigned counsel, and allege as follows:

## I.  INTRODUCTION

1.      This action arises out of a well-executed, carefully-crafted scheme (in fact, a Ponzi scheme, *i.e.*, a fraudulent investment operation that pays returns to prior investors from the monies paid by subsequent investors because the scheme does not actually generate revenue-producing activity) of the most insidious kind, *i.e.*, a religious-affinity-fraud orchestrated and/or facilitated by Defendants EPHREN TAYLOR ("TAYLOR'), EPHREN TAYLOR, SENIOR ("TAYLOR SR"), MESHELLE TAYLOR ("MTAYLOR"),  ERX ENERGY, LLC ("ERX"), EQUITY TRUST CORPORATION ("EQUITY TRUST"), ROBERT BATT ("BATT"), DONALD MACINTYRE ("MACINTYRE"), ALAN LIPINSKI ("LIPINSKI"), and CITY CAPITAL CORPORATION ("CITY CAPITAL") (described sometimes hereinafter as "Defendants").

2.      Defendants sold many of their targets promissory notes and/or unqualified, nonexempt securities (in their Self Directed Individual Retirement Accounts ("SDIRAS")[1] and then diverted the investment monies to themselves or shell corporations they controlled; and/or the principal investment funds of an investor was used to repay that same investor their purported returns or interest payments until the fraudulent scheme collapsed when it ran out of new investors more accurately described as "VICTIMS."

3.      Defendants TAYLOR, TAYLOR SR, MTAYLOR, CITY CAPITAL CORPORATION, ERX, BATT, and EQUITY TRUST will be referred to herein collectively as the "CITY CAPITAL CONSPIRATORS."

---

[1] A SDIRA is an Individual Retirement Account ("IRA") held by a trustee or custodian that permits investment in a much broader set of assets than is permitted by most IRA custodians.  However, investors in SDIRAs, whose administrators are also known as "custodians" or "trustees," are permitted to invest in a variety of nontraditional investment options of their own choosing including tax lien certificates, promissory notes, real estate,  businesses, LLCs and private placement securities.  A stark contrast exists between the "administration" performed by trustees and custodians of SDIRAs ("CUSTODIANS"), as compared to the "administration and management" performed by of the trustees and custodians of IRAs ("CIRAs"). CIRAs are considered fiduciaries of

4. The CITY CAPITAL CONSPIRATORS intentionally targeted and induced hundreds of innocent people, religious leaders, their churches and other faith-based organizations in at least 43 states to transfer and invest their hard-earned money in shell companies with a false sense of security that their money was insured, protected and invested by persons in legitimate, no risk, multi-million dollar, profitable, "leading" public and private companies with "the highest ethics," and an overriding sense of social responsibility.

5. In fact, the CITY CAPITAL CONSPIRATORS were neither licensed nor registered to sell securities or advise on investments under state or federal law. The purported "investments" they offered were neither licensed nor registered. Defendants' shell companies, some publicly-traded, through which the CITY CAPITAL CONSPIRATORS offered investments were operating illegally in flagrant violation of SEC and IRS regulations as well as state securities regulations and consumer protection laws. The CITY CAPITAL CONSPIRATORS sold Plaintiffs "interests" in nonexistent or failing ventures and illegal gambling operations secured by worthless promissory notes or nothing at all.

6. Defendants CITY CAPITAL and ERX as well as Amorocorp, Inc. a/k/a/ Amoro Management Group a/k/a Amoro Management, Inc., a/k/a Amoro Corp. f/k/a Ephren Taylor Capital Corporation (all collectively referred to herein as "Amoro") , Incoming, Inc. and Resilient Innovations, LLC are referred to herein as the CITY CAPITAL AFFILIATED COMPANIES.

7. Defendants falsely led Plaintiffs and the other Class Members to believe that their "investments" in the CITY CAPITAL AFFILIATED COMPANIES would help others who were less fortunate. Plaintiffs, relying on those representations, in good faith gave their hard-earned money to Defendants. Many investors lost their entire life savings.

## II.   JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 (d) (2) and the Class Action Fairness Act. Plaintiffs and certain Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

the IRA account such that CIRAs are responsible for maintaining and managing the securities in the IRA account, keeping track of distributions and dividend income, and making sure everything is done legally and correctly.

CLASS ACTION COMPLAINT                                                                2

SNYDER ♦ DORENFELD, LLP

9.      This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965, the Due Process Clause of the U.S. Constitution, and the California long-arm statute, Code of Civil Procedure § 410.10, which allows courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

10.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims arising under California state law for, *inter alia,* California Business and Professions Code § 17200 involving unfair competition and violation of California Corporations Code § 25000, *et seq.*, and for elder abuse pursuant to The Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code § 15600, *et seq.*

11.     Venue in this district satisfies the requirements of 28 U.S.C. § 1391 (b) (1)-(2) because some Defendants, and some class members reside in this jurisdiction and some of the actions and events giving rise to the claims occurred in this District.

12.     Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California Business and Professions Code § 17200 *et seq.*

### III.   THE PARTIES

13.     Plaintiff LIBERTY CITY CHURCH OF CHRIST, INC. ("LIBERTY CITY") is a Florida corporation with its principal place of business, which is a house of worship, in Miami, Florida.  In mid-2008, LIBERTY CITY invested $100,000 in Defendants' fraudulent enterprises.

14.     Plaintiff MARY DINISH ("DINISH") is an individual who is 64 years old and a resident of Jacksonville, Florida.  On or about June of 2008, DINISH invested $175,000 with the CITY CAPITAL CONSPIRATORS.

15.     Plaintiff KAUISHA SMITH ("SMITH") is an individual and a resident of Houston, Texas.   On or about January of 2009, SMITH invested $42,000 in CITY PETROLEUM, a purported division of CITY CAPITAL.

16.     Plaintiff LARRY RUCKS ("RUCKS") is an individual and a resident of Sacramento, California. On or about July of 2009, RUCKS invested $50,000 in a fraudulent investment scheme perpetrated by the CITY CAPITAL CONSPIRATORS.

SNYDER ♦ DORENFELD, LLP

17.   Plaintiff ROBERT BURKE ("BURKE") is an individual who is 82 years of age and a resident of Westland, Michigan.  On or about August of 2005, BURKE invested $10,000 in an affinity fraud promoted by TAYLOR as described below.

18.   Defendant EPHREN TAYLOR a/k/a EPHREN TAYLOR II a/k/a EPHREN TAYLOR, JR. a/k/a EPHRAIM TAYLOR a/k/a EPHRAIN TAYLOR ("TAYLOR") is an individual who last resided in the State of New York and is believed to be a fugitive having failed and refused to respond to a number of subpoenas from the SEC including a subpoena requiring his appearance for testimony.

19.   Defendant TAYLOR SR is an individual who resides in Overland Park, Kansas and is the father of TAYLOR and the father-in-law of MTAYLOR.

20.   At all times material hereto, TAYLOR SR was the minister of the Johnson County Church of Christ in Shawnee, Kansas.

21.   Defendant MTAYLOR is an individual who last resided in the State of New York and is now believed to be a fugitive along with her husband. At all times material hereto, TAYLOR and MTAYLOR were husband and wife.

22.   At all times material hereto, MTAYLOR was a beneficial and/or actual owner of all securities and interests owned by TAYLOR.   TAYLOR and MTAYLOR will be referred to collectively herein as ("THE TAYLORS").

23.   Defendant CITY CAPITAL CORPORATION ("CITY CAPITAL") is a Nevada corporation with its last known principal place of business in Cypress, California.

24.    Defendant ERX ENERGY, LLC ("ERX") is a wholly-owned subsidiary of CITY CAPITAL and is a Nevada corporation with its last known principal place of business in New Jersey.

25.    Defendant EQUITY TRUST CORPORATION ("EQUITY TRUST") is an Ohio corporation that bills itself as "the nation's leading provider of self-directed IRAs and 401ks, with over 128,000 clients in all 50 states and close to $10 billion dollars of retirement plan assets under administration."

26.   Defendant ROBERT BATT ("BATT") is an individual and resides in Cleveland,

SNYDER ♦ DORENFELD, LLP

SNYDER ◆ DORENFELD, LLP

1   Ohio.  At all times material hereto, BATT was an employee of EQUITY TRUST and held the

2   position of Retirement Account Specialist.

3       27.     Defendant ALAN LIPINSKI is an individual and resides in Santa Clara, California.

4   From October 25, 2011 until May 30, 2012, Lipinski served as Vice President and a member of the

5   Board of Directors of CITY CAPITAL and ERX.

6       28.     Defendant DONALD M. MACINTYRE is an individual and resides in San Jose,

7   California.  From October 25, 2011 until May 30, 2012, MACINTYRE served as Chairman of the

8   Board and CEO of CITY CAPITAL and ERX.

9       29.     At all times material hereto, Defendants TAYLOR, TAYLOR SR,    and

10  MTAYLOR were owners, officers, directors, shareholders and /or controlling principals that

11  owned, controlled, managed, and/or directed the activities of and/or obtained unlawful monies or

12  gains from the CITY CAPITAL AFFILIATED COMPANIES.

13      30.     Certain individuals who were co-conspirators with the CITY CAPITAL

14  CONSPIRATORS are not named in this Complaint.   The remaining CITY CAPITAL co-

15  conspirators which have been identified to date are not sued because they are either under criminal

16  investigation, have filed for bankruptcy or they have no attachable assets.  As to those who have

17  not yet been identified, Plaintiffs will seek leave to join them upon identifying same.

18                          **IV.   FACTUAL ALLEGATIONS**

19  **THE CREATION OF EPHREN TAYLOR'S PUBLIC IMAGE AND THE BUILDING**
    **OF HIS CREDIBILITY THROUGH SHELL COMPANIES**

20
21      31.     As part of his fraud scheme, TAYLOR created a public image based on lies and

22  misrepresentations.  While some of TAYLOR's investment success "stories" and personal financial

23  dealings may have been real, the majority of them were purely fabricated.  Many of these are listed

    below.

24
25          a.      He claimed to have come from humble beginnings;

26          b.      He bragged that he started working at 12 years old and became a

        millionaire at the age of 16.

27
28          c.      He claimed to have "retired" with his "vast fortune" but became

        "bored" and came back to work in 2000.

---

CLASS ACTION COMPLAINT                                                          5

d.      He claimed that in 1998 he had launched a company with a high school partner called GoFerretGo.com that became a multi-million dollar company.   Through repeated use of the GoFerretGo.com success story, TAYLOR was able to claim membership in the ultra exclusive "Teenage Millionaire Club."

e.      He repeatedly claimed in several different types of media that GoFerretGo.com had a value of $3.5 million at some point during its less-than-three-year history.   However, GoFerretGo.com mysteriously dissolved in 2001.

f.      From at least 2004 to 2010, he maintained a personal website, www.ephren.com, which targeted African Americans and other minorities and provided investment advice and information on the CITY CAPITAL AFFILIATED COMPANIES although TAYLOR was never a licensed investment broker, dealer or advisor.

g.      In 2006, he proclaimed himself the "youngest African-American CEO of any publicly traded company in United States history" and started preaching (literally) the concept of "socially conscious investing."

h.      From 2006 forward, he portrayed himself as a "Minister, financial guru, investment wizard, multi-million dollar business manager and philanthropic rock star," none of which was true.

i.      He claimed he was a successful businessman overseeing $250 million in assets of two publicly-traded companies.

j.      On May 13, 2007, TAYLOR posted an article on his website (www.urbanwealth.net) announcing his Urban Wealth Tour.   The Urban Wealth Tour was an 18 city tour beginning in Columbus, Ohio where TAYLOR spoke to communities and churches about economic empowerment and investment opportunities through the CITY CAPITAL AFFILIATED COMPANIES.   From 2007 until 2010, TAYLOR conducted

SNYDER ♦ DORENFELD, LLP

1   at least three of these national Urban Wealth tours that were used to solicit

2   new investors for the CITY CAPITAL AFFILIATED COMPANIES.

3   TAYLOR would advise participants to bring their 401k statements and IRA

4   statements so he could review them and convince them to invest in CITY

5   CAPITAL AFFILIATED COMPANIES.

6   k.      In mid-2005 and beyond, TAYLOR's carefully created persona

7   gained national media attention.   TAYLOR appeared on 20/20, The Today

8   Show, the Montel Williams Show, Fox News, CNBC, and on a multitude of

9   Christian television and radio shows.

10   l.      He also became a commentator on news and financial television

11   shows and radio broadcast.  All of this exposure and publicity did nothing

12   but add to TAYLOR's credibility as an elite investment advisor and added

13   authenticity to his investment recommendations in the CITY CAPITAL

14   AFFILIATED COMPANIES.

15   m.      He also took advantage of the success of his award winning books, to

16   solicit investors.  TAYLOR conducted several national book tours across the

17   U.S.  Book tours gave TAYLOR the opportunity to expand his visibility as a

18   successful businessman and professional investment advisor.

19   n.      In August of 2008, TAYLOR spoke at the Democratic National

20   Convention to the Young Leader's Summit on his socially conscious

21   corporate investment strategy.

22   o.      He used the Internet to facilitate fraudulent schemes by continually

23   repeating the purported success stories of his many business ventures.

24   32.    In 2004 Defendant TAYLOR formed Christian Capital Group, LLC ("Christian

25   Capital"), a Missouri limited liability company.  Defendant TAYLOR was the "executive trustee"

26   of Christian Capital.

27   33.    Christian Capital was purportedly a non-profit ministry that employs biblical

28   principles to help individuals increase their financial resources through low-risk investment

SNYDER ♦ DORENFELD, LLP

1  opportunities.

2  **DEFENDANTS BEGAN TO SELL UNREGISTERED SECURITIES
   EVEN THOUGH THEY WERE UNLICENSED TO SELL
3  SECURITIES OR SERVE AS INVESTMENT ADVISORS**

4      34.     As alleged herein, certain Defendants acted intentionally or with deliberate

5  recklessness in that they knew that the securities of the CITY CAPITAL CONSPIRATORS were

6  unregistered and that the CITY CAPITAL CONSPIRATORS were not licensed to sell securities or

7  serve as investment advisors and that the statements they disseminated to the investing public were

8  false when made.

9      35.     Defendants were motivated to engage in this fraudulent conduct because it is

10 believed that Defendants financed extravagant lifestyles for themselves and/or the fraudulent

11 conduct benefitted their corporate entities and personal businesses from the proceeds of their illegal

12 securities offering.

13     36.     The investments constitute investment contracts and therefore qualify as securities

14 under Section 2 (a) (a) of The Securities Act of 1933, 15 U.S.C.§77b(1) and Section 3(a)(10) of

15 The Securities and Exchange Act of 1934, 15 U.S.C.§78(a)(10).

16     37.     No registration statement has ever been filed in connection with the investment

17 contracts offered and sold by certain Defendants as alleged herein and no exemption from

18 registration applies.  Few, if any, of the purchasers or offerees qualified as accredited investors

19 under the federal securities law.

20     **TAYLOR BECOMES CEO OF CITY CAPITAL**

21     38.     In May of 2006, TAYLOR became CEO of CITY CAPITAL CORPORATION.

22     39.     In October of 2006, CITY CAPITAL CORPORATION signed a $50 million credit

23 facility with the Lucian Group.  This credit facility was terminated on June 13, 2007, seven (7)

24 months later.

25     40.     The CITY CAPITAL CONSPIRATORS were able to reach their VICTIMS by

26 devising and implementing sophisticated plans targeting minorities and African Americans through

27 television and radio ads, including Christian radio and television stations, e-mail advertising,

28 personal speaking engagements in communities and churches, YouTube videos, appearances on

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1   national television shows and news reports, personal meetings, blogs and websites and other

2   devices.  The ads led Plaintiffs and other VICTIMS into believing that the CITY CAPITAL

3   CONSPIRATORS were able to use the VICTIMS' monies, from self-directed IRAs, 401ks, and

4   personal credit, credit cards and cash to purchase investments in the CITY CAPITAL

5   AFFILIATED COMPANIES that would help working class families, single mothers, create new

6   jobs and affordable homes in these poorer communities while "guaranteeing" that investors would

7   double their return on investment ("ROI") within 12 months "risk free."  These schemes are known

8   as the Socially Conscious Investment Ponzi Scams.

9       41.   In fact, the Clean Sweeps Income sweepstakes machine investment through CITY

10  CAPITAL's wholly-owned subsidiary, Clean Sweeps Holding Group, LLC, was guaranteed as

11  "100% RISK-FREE" such that Plaintiffs and other victims were assured in writing by Defendants

12  that if they did not recoup their initial investment in the CITY CAPITAL CONSPIRATORS' Clean

13  Sweeps machines within one year or three months (Defendants used both pitches), their monies

14  would be returned. This scheme is referred to as the Clean Sweeps Machine Investment Ponzi

15  Scam.

16      42.   The CITY CAPITAL CONSPIRATORS for their Clean Sweeps Machine

17  investment scheme were able to reach their targeted VICTIMS by devising and implementing

18  sophisticated plans targeting potential investors through television and radio ads, e-mail

19  advertising, personal speaking engagements in communities and churches, You Tube videos,

20  appearances on national television and radio ads, personal meetings, blogs and websites and other

21  devices to attract and convince investors to use monies from their self-directed IRAs, 401ks,

22  personal credit, credit cards and cash to purchase sweepstakes machines through CITY CAPITAL

23  that were to be put in retail establishments around the country with promises of a no risk,

24  guaranteed rate of return in a 100% legal gambling operation.  Employees of CITY CAPITAL

25  received a 10% commission for the sale of each Clean Sweeps machine and TAYLOR received a

26  10% commission on the sale of each Clean Sweeps machine.

27      43.   TAYLOR's Urban Wealth tours permitted TAYLOR and the other CITY CAPITAL

28  CONSPIRATORS to take their Ponzi schemes to a national level by convincing civic and religious

---

CLASS ACTION COMPLAINT                                                                    9

SNYDER ♦ DORENFELD, LLP

1  leaders to permit TAYLOR to speak at a scheduled event and give TAYLOR access to their
2  members and participants.  Referring to himself as "Minister Taylor," many times TAYLOR gave
3  a sermon from the pulpit of a church on Sunday and later that day or the next day offered his
4  investment advice to church members-from that same pulpit.  TAYLOR always told his audiences
5  in closing to "Google" him and read all of his positive press.

6       44.    Sometime in mid-2007, the CITY CAPITAL AFFILIATED COMPANIES started
7  using a Tennessee business address.  But the address was a UPS store.

8       45.    In or around 2007, the CITY CAPITAL AFFILIATED COMPANIES also sold
9  interests in the phantom "Goshen Division" of CITY CAPITAL CORPORATION.  The Goshen
10 Division (a/k/a Goshen Energy and a/k/a Goshen Energy Division) is described by the CITY
11 CAPITAL CONSPIRATORS as focusing "primarily on developing biodiesel and other alternative
12 fuels created from plant matter and waste oil.  This division partners primarily with small colleges
13 and has been involved in natural gas and oil reclamation projects with select clients, where
14 marginal wells are revitalized, creating on-going cash-flow."

15      46.    By this time the CITY CAPITAL CONSPIRATORS knew that Goshen had already
16 lost the rights to the one oil and gas lease that they had attempted to purchase due to of lack of
17 funds.

18      47.    The Goshen Division was also mentioned in a press release by Defendants dated
19 June 9, 2009 indicating that CITY CAPITAL, through its wholly-owned subsidiary City Capital
20 Petroleum, LLC, had acquired a "retail petroleum distribution center with a convenience store
21 attached" in New York with supposedly "un-audited revenues of $3 million in 2008."   However,
22 there is no evidence CITY CAPITAL ever actually owned this Long Island gas station rather the
23 facts reveal that CITY CAPITAL was leasing it yet the CITY CAPITAL CONSPIRATORS sold
24 investment interests in this leased gas station to unsuspecting VICTIMS.

25      48.    TAYLOR is quoted in the June 9, 2009 press release as stating "With our Goshen
26 Energy division producing bio-fuels, we anticipate using our physical stations to distribute the fuel.
27 This will create a vertically integrated company from production to retailers."

28      49.    Shortly after TAYLOR became CEO of CITY CAPITAL CORPORATION, he

began moving investor funds from CITY CAPITAL CORPORATION to the bank accounts of other CITY CAPITAL AFFILIATED COMPANIES, using investor monies to pay his personal bills and credit cards as well as diverting funds to the personal bank accounts of TAYLOR and MTAYLOR.  It is unknown what happened to those investor funds once they were diverted to these bank accounts.

50.     On March 3, 2009, Defendant TAYLOR did an interview with a writer for forbes.com.  The story centered on TAYLOR's early success in business and again repeated the story about TAYLOR becoming a millionaire at 16.  The story noted that TAYLOR was the CEO of Defendant CITY CAPITAL and mentioned investments in oil wells through the CITY CAPITAL AFFILIATED COMPANIES.  However, at the time of this interview, TAYLOR knew that the CITY CAPITAL AFFILIATED COMPANIES had lost the rights to the oil and gas property it had purchased in 2007 because CITY CAPITAL did not make the July 2007 installment payment.

### LAWSUITS AND OTHER LEGAL TROUBLES FOR TAYLOR, TAYLOR SR, MTAYLOR, AND THEIR AFFILIATED ENTITIES

51.     TAYLOR, TAYLOR SR, and  MTAYLOR were sued for fraud in 2004 in the case of *Williford et al v. Ephren Taylor, Jr.* ("Williford Complaint") in Missouri both personally and as trustees sand/or agents of the Prosperity Ministries trust.  Also named as a defendant was TAYLOR SR's church, Johnson County Church of Christ ("Johnson County Church") in Shawnee, Kansas.

52.     To give him credibility with church members and with the actual knowledge of TAYLOR SR and MTAYLOR, TAYLOR told potential investors that his Prosperity Fund a/k/a Prosperity Ministries was affiliated with the Johnson County Church of Christ, where TAYLOR SR was a minister and where TAYLOR SR had designated TAYLOR as an "associate minister." This is the first known affinity fraud masterminded by TAYLOR with the assistance of TAYLOR SR and MTAYLOR.  Even after the filing of the *Williford* action, TAYLOR decided to expand his fraudulent schemes nationally with the help of TAYLOR SR and MTAYLOR as well as others.

53.     Subsequent to the *Williford* case being filed, Defendant TAYLOR SR assumed the title of "Consultant for Engineering" with TAYLOR's AmoroCorp companies.  TAYLOR SR was

SNYDER ♦ DORENFELD, LLP

listed as an "exempt employee" in AmoroCorp's company records and employee rosters.

54.     It is unknown what exactly TAYLOR SR was supposed to do as an engineering consultant for Amorocorp.  Although TAYLOR was purportedly soliciting investment monies nationally to develop properties in working-class neighborhoods and renovate potential rental investment properties, we now know that TAYLOR never pursued development of those properties, but instead was diverting the money for his personal use.  It is unknown how much compensation TAYLOR SR received for his "services" to Amorocorp.

55.     It is also unknown as to why TAYLOR SR, after learning about his son's fraudulent investment schemes in the *Williford* case, would agree to work for Amorocorp as an engineering consultant.

56.     TAYLOR SR continued to provide credibility to TAYLOR's investment schemes and refused and/or failed to warn TAYLOR's intended victims-who were all members of the same Christian sect that TAYLOR SR ministered to- of TAYLOR's investment schemes and fraudulent misrepresentations.

57.     In the beginning of his fraudulent crime spree, TAYLOR relied on TAYLOR SR to give him credibility with Church of Christ members and leaders to gain access to Church of Christ congregations -TAYLOR's intended victims.

58.     TAYLOR SR served as a reference for TAYLOR with Church of Christ leaders across the country and provided legitimacy to TAYLOR's investment schemes and affinity fraud by continuing the façade that TAYLOR was a "Christian Minister" just like TAYLOR SR.

59.     TAYLOR SR and MTAYLOR knew, at least by 2004, that TAYLOR was soliciting monies for investment securities from members of the Church of Christ for investments that did not exist or were illusory.  In addition, TAYLOR SR and MTAYLOR knew or should have known that TAYLOR was not licensed or registered to sell securities.

60.     Yet TAYLOR SR and MTAYLOR did nothing to stop or deter TAYLOR from executing these investment schemes or to warn TAYLOR's VICTIMS about TAYLOR.

61.     Instead, MTAYLOR  and TAYLOR SR received compensation and/or monies from the monies TAYLOR was stealing from TAYLOR's  "investment clients."

1    62.    With the money from her husband's VICTIMS, MTAYLOR pursued an ill-advised

2  music and acting career that never came to fruition.

3              **MORE LAWSUITS BEGIN TO BE FILED AGAINST**
              **TAYLOR AND HIS SHELL COMPANIES**

4    63.    On October 5, 2005, Defendant TAYLOR and his company, Amoro Investment

5  Corporation, a Tennessee corporation, was sued in San Francisco, California (*Lake Street Partners,*

6  *Inc. v. Amoro Investment Corporation, et al*, Case No. 05-445583, San Francisco Superior Court).

7    64.    The complaint alleged that Defendant TAYLOR and Amoro Investment

8  Corporation entered into two written promissory notes with the plaintiff/investor for a total of one

9  million dollars ($1,000,000) and that TAYLOR guaranteed both notes personally.  However, when

10  Plaintiff demanded payment, TAYLOR refused.

11    65.    It is unknown whether Defendant TAYLOR and Amoro Investment Corporation

12  ever paid the plaintiff in the Lake Street Partners case.  However, on August 27, 2007, Defendant

13  TAYLOR's company, Amoro Investment Corporation, was administratively dissolved by the state

14  of Tennessee.

15    66.    On July 6, 2007, the SEC revoked the registration of securities for AmoroCorp for

16  failure to make required periodic filings.  It is believed that TAYLOR deliberately failed to make

17  the required SEC periodic filings so that no one could ascertain the actual financial status of

18  AmoroCorp by reviewing its publicly filed financial statements.

19    67.    On December 8, 2008, TAYLOR, CITY CAPITAL, AmoroCorp, Ephren Capital

20  Corporation, Escrow Express, LLC, Amoro Management Group LLC, and Own the Pond, LLC

21  were sued in Kansas Federal District Court for securities fraud.  Plaintiff claimed damages of

22  $150,000. (*Escalada et al v. Taylor et al*, Case No. 6:2008cv1379, Sedgwick, Kansas).

23    68.    In September and October of 2010, most of the Clean Sweeps operations were shut

24  down by local law enforcement as illegal gambling operations.  However, the CITY CAPITAL

25  CONSPIRATORS continued to take in and process investment funds for the Clean Sweeps

26  machines without advising investors that the operations had already been shut down.  In total, the

27  CITY CAPITAL CONSPIRATORS sold Clean Sweeps machines to over 250 investors in multiple

28  states.

SNYDER ◆ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                    13

69.     On June 3, 2010, the State of Illinois, Securities Department issued a Temporary Order of Prohibition charging TAYLOR, CITY CAPITAL and Clean Sweep Holdings, with failure to register securities and soliciting through an unregistered Dealer/Salesperson based upon advertising by Defendants on the radio in Chicago from April 12-16, 2010.

70.     On December 21, 2010, a Cease and Desist Order was issued by the State of Alabama Securities Commission against Defendants TAYLOR, CITY CAPITAL CORPORATION and others.

71.     The Alabama resident who had filed the complaint with the State of Alabama had attended an investment seminar in Orlando, Florida where TAYLOR was a speaker.  This investor was issued two promissory notes, one for $50,000 and one for $25,000. The notes had an annual return on investment (ROI) of 20.00% (net after fees) and an annual cash return of $10,000.00 per unit.  The Alabama Securities Commission concluded that the CITY CAPITAL CONSPIRATORS were operating as an unlicensed and unregistered securities dealer and therefore violated Alabama securities law.

72.     In February of 2011, the I-Team Fox News ("I-Team") in Atlanta published a news article and aired a news story concerning a scandal linked to Bishop Eddie Long and his church. Long's church is the New Birth Missionary Baptist Church ("New Birth") in Georgia. TAYLOR made a presentation at New Birth about the Clean Sweeps sweepstakes video game machines and then the parishioners started investing in CITY CAPITAL, for the purpose of purchasing Clean Sweeps machines.

73.     However, the I-Team investigation revealed that in September of 2010 police in Virginia had raided a number of sweepstakes store fronts and charged 11 owners or companies with illegal gambling.  One of them was CITY CAPITAL through Clean Sweeps. At the same time, Bishop Long posted a You Tube video appealing to TAYLOR to return his parishioners' investment money which Long indicated totaled about $1,000,000.

74.     TAYLOR responded to Bishop Long's plea by stating that CITY CAPITAL was already working on settling with all of the New Birth members and returning their money. However, there is no evidence that any New Birth members received any of their investment

SNYDER ♦ DORENFELD, LLP

1   monies back as TAYLOR had promised.

2       75.     In March of 2011, the North Carolina Attorney General announced an investigation

3   of Clean Sweeps Holdings based upon consumer complaints from buyers of investments in Clean

4   Sweeps via CITY CAPITAL.

**EQUITY TRUST AND BATT WERE ACTIVE PARTICIPANTS IN THESE
INVESTMENT PONZI SCHEMES AND RELIGIOUS-AFFINITY-FRAUDS AND
KNOWINGLY PROVIDED AUTHENTICITY AND CREDIBILITY TO DEFENDANTS'
INVESTMENT SCHEMES**

        76.     The CITY CAPITAL CONSPIRATORS were locked arm-in-arm as they advertised

and promoted nationally their close working relationship.  In fact, in documents they went so far as

to state that CITY CAPITAL CORPORATION both "controlled the investments" transferred to

EQUITY TRUST and worked "directly" with EQUITY TRUST.

        77.     In   investor   solicitation   documents   prepared   by   the   CITY   CAPITAL

CONSPIRATORS, the "close working relationship" between EQUITY TRUST and CITY

CAPITAL was emphasized as proof of the legitimacy of the investments being offered by the

CITY CAPITAL CONSPIRATORS.  In addition, investor solicitation documents tout that CITY

CAPITAL pre-paid all setup and management fees for EQUITY TRUST.

        78.     By their own admission, the CITY CAPITAL CONSPIRATORS illegally controlled

the investment monies, belonging to Plaintiffs and other Class Members, in EQUITY TRUST.

        79.     EQUITY TRUST and BATT viewed and treated TAYLOR and the other CITY

CAPITAL affiliated companies as their partner and client, not the Plaintiffs and other Class

Members, which is why when the money ran out and the Ponzi scheme crumbled, EQUITY

TRUST and BATT refused to provide assistance or help the Plaintiffs and Class members

understand what happened to their investment money.

        80.     Upon information and belief, EQUITY TRUST sent e-mail solicitations and letters

to potential CITY CAPITAL CONSPIRATOR targets touting the opportunity for inexperienced

investors to open a SDIRA and invest in the CITY CAPITAL AFFILIATED COMPANIES.

        81.     EQUITY TRUST and BATT did more than just assist the CITY CAPITAL

CONSPIRATORS.  They also solicited potential investors, advertised investment opportunities in

the CITY CAPITAL AFFILIATED COMPANIES, and convinced the VICTIMS to invest even

SNYDER ♦ DORENFELD, LLP

_____

CLASS ACTION COMPLAINT                                                          15

though they knew the CITY CAPITAL CONSPIRATORS were not licensed or registered to sell securities.  BATT and EQUITY TRUST even served as "references" for TAYLOR with potential investors regardless of whether the investor was going to invest through a SDIRA.  Additionally, BATT and EQUITY TRUST knew that the investments the CITY CAPITAL CONSPIRATORS were selling were illegal under state and federal securities law.

82.     Defendant EQUITY TRUST is prominently mentioned in marketing documents prepared for CITY CAPITAL and the CITY CAPITAL AFFILIATED COMPANIES as the ONLY Company that manages self-directed IRAs for CITY CAPITAL to give TAYLOR further credibility with his intended victims.

83.     BATT served as the sole liaison between EQUITY TRUST and investors in the CITY CAPITAL AFFILIATED COMPANIES and BATT also served as a liaison and reference between the CITY CAPITAL CONSPIRATORS and other TAYLOR investors who did NOT invest through an EQUITY TRUST SDIRA.

84.     BATT was introduced to the Plaintiffs and other Class Members as TAYLOR's personal investment banker.  BATT gave TAYLOR another layer of credibility through his position as an agent/employee of EQUITY TRUST and established TAYLOR as an affluent investment advisor.

85.     BATT also served as a business and personal "reference" for TAYLOR and the CITY CAPITAL AFFILIATED COMPANIES with TAYLOR's intended victims.  If potential investors inquired as to TAYLOR's investment success, experience, etc. they were given BATT's contact information and BATT would provide an excellent reference regardless of whether the potential investor was going to invest through a self-directed IRA or in cash.

86.     BATT was present at multiple investment seminars, including many at churches, given by TAYLOR where TAYLOR referred to EQUITY TRUST as his business partner and TAYLOR stated that CITY CAPITAL "managed" the investments of its clients/investors that were held by EQUITY TRUST.

87.     BATT falsely told TAYLOR's targets at churches and other investment seminars given by TAYLOR that monies invested through EQUITY TRUST were fully insured by the

SNYDER ◆ DORENFELD, LLP

1    FDIC.

2        88.    TAYLOR frequently emphasized EQUITY TRUST's size and experience as a

3    CUSTODIAN as further evidence of the strength of the CITY CAPITAL team and used the

4    EQUITY TRUST name frequently to add credibility to the investment schemes the CITY

5    CAPITAL CONSPIRATORS were constantly pumping in press releases and other media.

6        89.    TAYLOR marketed the CITY CAPITAL investment vehicles to potential investors

7    as a seamless way to invest.  TAYLOR kept emphasizing in other interviews and articles as well as

8    blogs that the "ease" of investing in CITY CAPITAL as "hassle free" was a major advantage

9    because CITY CAPITAL managed and controlled the investment therefore providing busy

10   investors with a worry-free investment opportunity.

11       90.    The CITY CAPITAL CONSPIRATORS kept tight control over the direction of

12   investments and creation of self-directed IRAs to BATT and EQUITY TRUST.  The CITY

13   CAPITAL CONSPIRATORS wanted to make sure they controlled the investment and the

14   communications with the investors in the CITY CAPITAL AFFILIATED COMPANIES such as

15   Plaintiffs and the other Class Members so that no suspicions were aroused.

16       91.    The CITY CAPITAL AFFILIATED COMPANIES startED defaulting on investor

17   loans and notes in mid-2007.

18       92.    Yet BATT and EQUITY TRUST kept making money on the "administration" of the

19   VICTIMS' self-directed IRA accounts.  In fact, BATT boasts in his Linked- In biography that

20   during his tenure with EQUITY TRUST he was ranked number seven (7) in sales during EQUITY

21   TRUST'S 36 years of business by generating $3,000,000 in new revenue for EQUITY TRUST.

22       93.    As of December 31, 2007, CITY CAPITAL CORPORATION had less than

23   $100,000 in cash and AmoroCorp owed CITY CAPITAL CORPORATION over $2 Million.

24       94.    In addition, CITY CAPITAL CORPORATION was in default on one of its notes

25   payable with a principal of $250,000 and accrued interest of $475,683.

26       95.    Also as of this time, CITY CAPITAL CORPORATION had not filed its 2005 or

27   2006 tax returns.

28       96.    In 2008, CITY CAPITAL CORPORATION first issued the 3 Simple Steps

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                    17

marketing brochure where EQUITY TRUST was prominently mentioned.  The CITY CAPITAL CONSPIRATORS falsely indicated that Plaintiffs' and the other Class Members' self-directed IRA deposits were insured by the FDIC for up to $250,000.  In fact, only cash deposits were insured by the FDIC.  The marketing documents of CITY CAPITAL indicated that all fees for EQUITY TRUST were pre-paid by CITY CAPITAL.

97.     In April of 2008, TAYLOR indicated that he was opening a new CITY CAPITAL office near Wall Street in New York.  The address for this "Wall Street" office turned out to be a "virtual office," *i.e.*, simply rental of an address and not a real physical location.

98.     The CITY CAPITAL CONSPIRATORS maintained an 800 number for www.iracashflow.com and www.citycapcorp.com where unlicensed and unregistered telemarketing sales reps sold SDIRA investment vehicles with BATT as the sole contact and EQUITY TRUST as the exclusive CUSTODIAN.  All of the sales reps were paid on a commission basis only and the entire operation was illegal.

**USING MONEY FRAUDULENTLY OBTAINED FROM THE PLAINTIFFS
TO FINANCE MUSIC VIDEOS**

99.     In January of 2009, the TAYLORS uploaded a You Tube video of MTAYLOR's first record release titled "I can be that." It is unknown exactly which of the VICTIMS' investment monies were used to produce this music video and the corresponding record but it is believed that the TAYLORS used monies from the Plaintiffs and other Class Members to fund production of MTYALOR's record and music video through an entity called Resilient Music.  It is unknown whether MTAYLOR ever made any sales from this record or music video.

100.     The TAYLORS made another music video and record in 2010 starring MTAYLOR. This record, titled "Billionaire (I don't care)" was produced by Flash Rodriguez, CEO of the FEAM Group, who was supposedly an artist development expert in the music industry. It is unknown which VICTIMS' monies was used to finance this music production.

**THE CLEAN SWEEPS MACHINE INVESTMENT PONZI SCAM**

101.     On January 7, 2010, the CITY CAPITAL CONSPIRATORS uploaded a video to YouTube about a Sweep Income RISK-FREE Investment Opportunity presented by TAYLOR.

102.     Money for an investment in the Clean Sweeps machines would come in to a Clean

SNYDER ♦ DORENFELD, LLP

SNYDER ◆ DORENFELD, LLP

Sweeps Bank of America account (Account number 237018134155) controlled by the CAPITAL CITY CONSPIRATORS from either:

      a.  EQUITY TRUST for self-directed IRA investments or 401k transfers;

      b. Credit card payments which were processed for CITY CAPITAL related entities; or

      c. Cash payments deposited by investors into a Bank of America Clean Sweeps account ("Sweeps Monies").

103.   Sweeps Monies would then be moved by the CITY CAPITAL CONSPIRATORS from the Sweeps Monies account to multiple accounts owned and/or controlled by the CITY CAPITAL CONSPIRATORS and/or the CITY CAPITAL AFFILIATED COMPANIES.

104.   The bank and credit card accounts for purchase of Clean Sweeps machines were finally shut down by Bank of America for suspicious activity in October of 2010.

105.   Telemarketing sales reps for CITY CAPITAL illegally operated a "telephone room" selling Clean Sweeps machines as an investment which could be purchased through the client's SDIRA by moving the SDIRA over to EQUITY TRUST, with credit cards or with cash.  The sales representatives were paid on a commission basis only.

106.   Investors who had already "qualified" for the Socially Conscious Investment Ponzi Scam were also "qualified" to apply for the Clean Sweeps Machine Investment Ponzi Scam. Indeed many investors invested in both of the schemes with no idea that neither was a legal, legitimate investment opportunity.

107.   The CITY CAPITAL CONSPIRATORS initiated thousands of  "Robocalls" (A Robocall is a term for an automated phone call that uses both a computerized autodialer and a computer-delivered pre-recorded message) to prior and current investors in the CITY CAPITAL AFFILIATED COMPANIES to attempt to sell them Clean Sweeps machines.

108.   By May of 2010, the CITY CAPITAL CONSPIRATORS were telling potential investors in the Clean Sweeps scam that CITY CAPITAL had been in the sweepstakes machine business for 3 years, had over 100 locations, 3,000 machines and that 20% of the proceeds of the sweepstakes machines went to charity.  None of these statements were true.

**MORE FRAUDULENT AND FAILED VENTURES**

109.    On June 15, 2010, CITY CAPITAL filed a Form 10-K ("June 09 10K") with the SEC.  This annual report was for CITY CAPITAL's fiscal year ending December 31, 2009.  The June 09 10K indicates that CITY CAPITAL sold its operating subsidiary Perfect Turf, Inc. incurring a loss of $64,170.00.

110.    The June 09 10K further states that City Laundry Services, LLC ("City Laundry") which was formed on January 22, 2009 to purchase laundry cleaning businesses.

111.    The June 09 10K indicates that CITY CAPITAL purchased 3 laundries between February and April of 2009 and sold 2 of the 3 in November of 2009.  None of the laundries were operational by December of 2010 and in fact the last laundry was shut down due to CITY CAPITAL's failure to pay the rent.

112.    CITY CAPITAL also purchased City Juice Systems KS, LLC ("City Juice") which later acquired L.A. Juice Company, Inc. and Blends 101, LLC.  Both the L.A. Juice location and the Blends 101 location were closed by CITY CAPITAL after attempts to sell them failed.  City Beauty Systems, LLC ("City Beauty") purchases health and beauty businesses and was still in existence at the time of the filing of the June 09 10K.  However, although CITY CAPITAL received investment monies in City Beauty, no investment properties were ever purchased by City Beauty and no one knows what happened to those investment monies.

113.    According to CITY CAPITAL's SEC filings, City Capital Petroleum, LLC ("City Petroleum") purchased gas stations.  Upon information and belief, City Capital Petroleum never purchased a gas station, it only leased one.  This gas station closed in 2010 due to declining revenues.

114.     Nitty Gritty, LLC was owned by City Capital and was a social network and internet training site. CITY CAPITAL indicated it was for sale in the June 09 10K.

115.    CITY CAPITAL owned 33% of The Millionaire Lifestyle Group which ceased operations in December of 2009.

116.    CITY CAPITAL also owned a 2.18% interest and was a managing member in NYC Liquidation Group, LLC.  These were Ebay drop-off locations which were closed in July of 2009

SNYDER ♦ DORENFELD, LLP

after being purchased for over a quarter of a million dollars in January of 2009.

117.   CITY CAPITAL owned a 40% interest in The Male Room, LLC which was closed in December of 2009.

118.   As of December 31, 2009 CITY CAPITAL had a total of 28 employees: 15 administrative staff and 13 customer service employees.

119.   CITY CAPITAL incurred net losses of $6,316,328 for the year ending December 31, 2009 and $2,602,457 for the year ending December 31, 2008.   Yet EPHREN TAYLOR received compensation of cash and stock of over one million dollars from CITY CAPITAL in each of those years.

120.   As of December 31, 2009 CITY CAPITAL had closed nine properties and generated $94,010 in revenues from its credit investor program.

121.   The June 09 10K indicates that CITY CAPITAL's accounting firm expressed doubt that CITY CAPITAL could continue as a going concern because of its accumulated deficit of $18,468,522.

122.   As of December 31, 2009, CITY CAPITAL had a working capital deficit of $7,186,142.

123.   As of December 31, 2009, TAYLOR's AmoroCorp owed CITY CAPITAL $1,635,174, the balance on an outstanding promissory note for monies borrowed by AmoroCorp from CITY CAPITAL.

124.   In late 2009 and early 2010, some of the promissory notes of investors held in EQUITY TRUST SDIRAs with the CITY CAPITAL AFFILIATED COMPANIES began maturing and the investors wanted to cash out.  However, these investors were unable to do so.  By February 2010 EQUITY TRUST and BATT were receiving multiple calls from anxious investors in the CITY CAPITAL AFFILIATED COMPANIES who wanted their money back.  EQUITY TRUST and BATT simply referred the investors back to TAYLOR.

**TAYLOR'S EMPIRE BEGINS TO CRUMBLE AS THE FRAUD GETS EXPOSED**

125.   Beginning in May of 2010, the CITY CAPITAL CONSPIRATORS started

SNYDER ♦ DORENFELD, LLP

1   receiving an increasing number of customer complaints in their telemarketing call center in

2   Raleigh, North Carolina.  Customers who had purchased Clean Sweeps machines in late 2009 or

3   early 2010 were complaining that they had not received any income from the machines as they had

4   been promised, or that their machines had never been placed and activated or that the amount of

5   return investment they received was substantially lower than what they had promised they would

6   receive or that they were being overcharged by EQUITY TRUST.

7        126.   Sometime prior to June of 2010, EQUITY TRUST started notifying VICTIMS who

8   had invested in Clean Sweeps machines through EQUITY TRUST SDIRAs that EQUITY TRUST

9   was terminating its services as their CUSTODIANS although EQUITY TRUST claimed to be a

10   "Passive Custodian" without authority to control its customers' investments including Plaintiffs

11   herein. By August of 2010, the CITY CAPITAL telemarketing call center in Raleigh could not

12   handle all of the complaint calls due to the frustration of dealing with the non-stop angry customer

13   calls.  Many CITY CAPITAL employees walked out or simply did not show up for work again.

14        127.   EQUITY TRUST and BATT were also receiving calls from worried and angry

15   investors trying to find out what happened to their investments. EQUITY TRUST and BATT

16   refused to assist the investors including Plaintiffs.  The accounts of the Plaintiffs revealed little

17   about their investments other than their initial purchase of the business, machine or real estate and

18   that they held a promissory note.  EQUITY TRUST and BATT refused to provide any other

19   information.

20        128.   It is estimated that less than 20% of the investment proceeds received by the CITY

21   CAPITAL CONSPIRATORS were ever actually invested in real estate, sweeps machines or

22   anything else.  The remaining proceeds were misappropriated and diverted by the CITY CAPITAL

23   CONSPIRATORS to pay themselves, pay earlier investors, or solicit new investors to perpetuate

24   Defendants' fraudulent schemes.

25        129.   On November 2, 2010, CITY CAPITAL announced the resignation of Defendant

26   TAYLOR as CEO and Chairman of the Board of CITY CAPITAL effective October 22, 2010.

27        130.   On November 23, 2010, TAYLOR held a conference call with investors of CITY

28   CAPITAL.  TAYLOR told the investors that they would receive a full refund for their investments.

SNYDER ♦ DORENFELD, LLP

1    That refund never materialized.

2          131.    On June 3, 2010 (the same day that the Illinois Securities Department issued a

3    Temporary Order of Prohibition), Defendants issued a press release announcing that 21 Clean

4    Sweeps terminals had been placed in Rolesville, North Carolina.  Incredibly, the press release

5    states that the Clean Sweeps program is *100% legal.*

6          132.    In April of 2012, the SEC filed a civil enforcement action against TAYLOR ( Case

7    1:12-cv-01249-WSD) in Atlanta, Georgia alleging that TAYLOR and his cohorts had stolen at

8    least $11 million in a Ponzi scheme/affinity fraud involving the sale of unregistered securities by

9    unlicensed agents..

10                       **HOW THE NAMED PLAINTIFFS HAVE BEEN DUPED**
                    **AND SWINDLED BY TAYLOR AND HIS CO-CONSPIRATORS**

11      **PLAINTIFF LIBERTY CITY UNKNOWINGLY INVESTS IN A PONZI SCHEME**

12         133.    In November of 2007, at a church conference in Terrell, Texas held at Southwestern

13   Christian College, representatives of LIBERTY CITY met TAYLOR who was one of the main

14   speakers for a program known as the Sound Doctrine Foundation.

15         134.    In 2008, representatives of LIBERTY CITY again saw TAYLOR conduct a seminar

16   entitled "Young Person Empowerment" in south Florida. Representatives of LIBERTY CITY

17   talked to TAYLOR after the seminar and TAYLOR indicated he was going to be in Miami again

18   soon and would come to LIBERTY CITY to speak with their members about investing.

19         135.    In mid-2008, TAYLOR returned to Miami, where he met with various

20   representatives of LIBERTY CITY.  LIBERTY CITY decided to invest a portion of its building

21   fund into TAYLOR's investment properties through CITY CAPITAL.

22         136.    TAYLOR told LIBERTY CITY that CITY CAPITAL bought and rehabbed

23   depressed homes selling them at a nice profit which was much greater than that offered by other

24   investment opportunities.

25         137.    TAYLOR advised LIBERTY CITY that he would create a limited liability company

26   to make and hold the investment which TAYLOR would manage. TAYLOR formed Title One

27   Holdings, LLC ("Title One") and then LIBERTY CITY in March of 2008 deposited a cashier's

28   check for $100,000 into the Title One bank account which TAYLOR controlled.

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                    23

138.   LIBERTY CITY does not know what happened to their investment, or the properties they were allegedly investing in through the CITY CAPITAL CONSPIRATORS but they do know that their investment is now worthless.

**PLAINTIFF MARY DINISH INVESTS IN DEFENDANTS' PONZI SCHEMES**

139.   On a Sunday morning in September of 2008, EPHREN TAYLOR delivered the sermon from the pulpit of the Westside Church of Christ in Jacksonville, Florida ("Westside Church").  In the audience was Plaintiff MARY DINISH who was and is a member of the Westside Church congregation.

140.   TAYLOR introduced himself to the Westside Church congregation and talked about his phenomenal business success from a young age.  TAYLOR told the congregation about the millions he had made as a teenager from the design of a video game which his parents helped him patent and how he had developed the "tab" marketing strategy used by Dominos Pizza on their pizza boxes to offer special deals and encourage sales.  TAYLOR also told the congregation that he was the minister of a Church of Christ in Kansas.

141.   TAYLOR  announced during his sermon that the following Saturday, TAYLOR was going to hold an investment seminar for members of the Westside Church congregation so that they could learn how to invest through TAYLOR  and get a superior return on their investments while also benefitting the Westside Church.

142.   In fact, TAYLOR told the congregation, including DINISH, that to "qualify" for participation in TAYLOR's investment opportunities the members of the congregation had to agree to give 10% of the income they earned on their investments with TAYLOR "to the Lord" through donations to either the Westside Church or another religious organization.  TAYLOR emphasized that if a potential investor was not willing to commit the 10% tithe to the Lord that TAYLOR required, TAYLOR would not accept their investment.

143.   Having a son that was close to TAYLOR's age and wanting to help her church and community, MARY DINISH was excited about the investment opportunity that TAYLOR presented and DINISH was very impressed with TAYLOR's personally. As an African-American, DINISH knew the struggles faced by African-Americans trying to start businesses or obtain

financing to start a business.  Having grown up in the Church of Christ, DINISH was delighted to see a member of the Church of Christ body of believers reaching out to educate the African-American Christian community about how to use their investment money wisely while helping others and their church.

144.    DINISH knew that the Westside Church was trying to open a daycare center for children and DINISH decided that if she invested with TAYLOR she would donate her 10% "tithe" from her investment with TAYLOR to the Westside Church daycare project.

145.    DINISH attended TAYLOR's investment seminar at Westside Church the next Saturday.  TAYLOR told the 25-30 people in the audience that TAYLOR was using his investors' funds to purchase properties that were in foreclosure in Chicago and New York, rehabilitate the property and then rent it out for investment income.  TAYLOR told the audience that his investors were getting a 10% return on their investments in this program.

146.    After the investment seminar, DINISH made an appointment for a one-on-one meeting with TAYLOR to discuss her potential investment.  TAYLOR had told the investment seminar participants to bring their investment account information with them when they met privately with TAYLOR and then he could recommend an appropriate investment for them with his companies.

147.    DINISH had an IRA with $175,000 in it with New York Life that she had saved over 31 years.  DINISH brought her paperwork for this IRA to the meeting with TAYLOR.  Due to his poor health, DINISH's husband did not attend the meeting with TAYLOR.  TAYLOR told DINISH that a personal account would be set up for her with EQUITY TRUST by TAYLOR and that TAYLOR would take care of all of the paperwork.

148.    After this meeting, DINISH received the paperwork from TAYLOR to open her EQUITY TRUST SDIRA and also wire the funds from her IRA to EQUITY TRUST.  DINISH did not have to fill out any of the paperwork for these transactions, all of the information had already been completed by TAYLOR - DINISH just had to sign the documents.

149.    DINISH never spoke with nor had any contact with anyone at EQUITY TRUST before or at the time her EQUITY TRUST SDIRA was opened in June of 2008.  DINISH only

SNYDER ♦ DORENFELD, LLP

1  dealt with TAYLOR and TAYLOR handled all communications on behalf of DINISH with

2  EQUITY TRUST.

3       150.    In June of 2008, Plaintiff MARY DINISH invested $175,000 in CITY CAPITAL's

4  "Community Renaissance" project.

5       151.    DINISH, like other Class Members, received a one year promissory note from CITY

6  CAPITAL as the "Maker" signed by TAYLOR.  The promissory note contained a 10% annual

7  interest rate for one year.

8       152.    In June of 2009, DINISH extended  her 2008 promissory note with CITY CAPITAL

9  until March 27, 2010 after receiving $17,500 in investment interest for the first year of her

10  investment which was deposited into DINISH's EQUITY TRUST SDIRA.  DINISH then gave the

11  Westside Church $1750 for its daycare fund as her 10% "tithe" from her investment with CITY

12  CAPITAL

13       153.    Sometime later in 2009, DINISH contacted TAYLOR and advised him that she

14  needed to start taking monthly withdrawals from her EQUITY TRUST SDIRA because of

15  escalating medical bills for her ailing husband who was blind and had diabetes.  DINISH and

16  TAYLOR agreed that DINISH would take a monthly draw of $1400 from DINISH's EQUITY

17  TRUST SDIRA to help DINISH pay for her husband's medical bills and medications.  DINISH

18  was paying $500 a month for her husband's insulin alone.

19       154.    So in mid-2009, DINISH started taking withdrawals from her EQUITY TRUST

20  SDIRA to help pay her husband's medical bills.  However, in March of 2010 DINISH did not

21  receive her monthly withdrawal from her EQUITY TRUST SDIRA.  At the same time, DINISH's

22  husband had become gravely ill, his medical insurance coverage had ceased and DINISH was

23  facing escalating medical bills for her husband's care.

24       155.    DINISH called the CITY CAPITAL offices in North Carolina to find out why she

25  had not received her SDIRA withdrawal money.  DINISH was told by an employee of CITY

26  CAPITAL that there must be some kind of "glitch" in her EQUITY TRUST SDIRA.

27       156.    DINISH then contacted EQUITY TRUST.  To her surprise, representatives of

28  EQUITY TRUST told DINISH that the reason she had not received her monthly withdrawal

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT

payment was because the money for the monthly withdrawal had not been deposited into her SDIRA.  DINISH did not understand what the EQUITY TRUST representative was referring to about money being deposited into her SDIRA since DINISH thought her monthly withdrawal was coming from the money in her SDIRA.

157.    After talking to representatives of EQUITY TRUST, DINISH learned that each month TAYLOR or someone at CITY CAPITAL was depositing $1400 into her EQUITY TRUST SDIRA from an unknown account.  DINISH was puzzled by this information.  DINISH eventually received her March 2010 EQUITY TRUST SDIRA withdrawal funds but after that DINISH only received one more monthly distribution in 2010 and has never received any further funds from her SDIRA.

158.    Around this same time, CITY CAPITAL requested that DINISH sign another extension of her 2008 CITY CAPITAL promissory note that had previously been extended to March of 2010 but DINISH refused. DINISH had become suspicious about where her EQUITY TRUST SDIRA money was actually being held and why money was being deposited into her SDIRA account each month to cover her withdrawals.  DINISH did not understand why it would be necessary for CITY CAPITAL or TAYLOR to deposit funds into her SDIRA when her EQUITY TRUST SDIRA account statements indicated that her SDIRA value was over $175,000.

159.    DINISH's EQUITY TRUST account revealed little about her investment other than the fact that the investment was secured by a promissory note.

160.    For more than two years, DINISH's EQUITY TRUST SDIRA statements contained the same notation: "Awaiting Receipt: Promissory Note."

161.    DINISH's husband passed away in the summer of 2010.  So in September or October of 2010 DINISH sent EQUITY TRUST the paperwork necessary to take her husband's name off her EQUITY TRUST SDIRA as a beneficiary and put the names of her children on her SDIRA instead.

162.    But DINISH got a call from EQUITY TRUST once they received her paperwork to change the beneficiary on her SDIRA account. A representative of EQUITY TRUST told DINISH that she could not change her SDIRA account information because the money in her SDIRA was

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1 gone. The EQUITY TRUST representative also told DINISH that she only had $1000 in her

2 SDIRA.  DINISH tried to reach BATT, CITY CAPITAL's liaison with EQUITY TRUST, to find

3 out what happened to her money but DINISH was unable to ever reach BATT and BATT never

4 returned her calls.

5      163.   DINISH finally reached Kinetra Dixon at CITY CAPITAL.  Kinetra told DINISH

6 that she could not discuss DINISH's CITY CAPITAL investment account with DINISH because

7 Kinetra had been instructed by TAYLOR that all calls by CITY CAPITAL investors had to be

8 referred to TAYLOR directly and that Kinetra could not provide any CITY CAPITAL investors

9 with any information.  DINISH tried to reach TAYLOR but despite repeated attempts, DINISH has

10 never been able to reach TAYLOR and TAYLOR has not returned DINISH's calls.

11     164.   To this day, DINISH has never found out what happened to her SDIRA assets of at

12 least $175,000 that were held by EQUITY TRUST.  TAYLOR is now a fugitive and has been

13 accused by the SEC and other state securities regulators of running a multi-million dollar Ponzi

14 scheme.

15     165.   Yet DINISH's EQUITY TRUST statements year after year continued to reflect that

16 her SDIRA was valued at over $175,000 and never indicated that her promissory notes had expired

17 and/ or were in default. DINISH's SDIRA statements from EQUITY TRUST failed to accurately

18 reflect the fair market value of her SDIRA assets.  EQUITY TRUST also failed to disclose that her

19 SDIRA assets had been stolen by Taylor and become worthless and that the purported security for

20 her SDIRA assets was in default and no longer viable.  EQUITY TRUST also did not ascertain the

21 actual value of the SDIRA assets owned by DINISH and failed to report the actual value of her

22 SDIRA to the IRS as required by law.

23     166.   DINISH and the other Class members were told repeatedly that TAYLOR and

24 CITY CAPITAL had set up a trust fund to reimburse VICTIMS of the CITY CAPITAL Ponzi

25 schemes and that Defendants would return DINISH's investment funds and/or repay DINISH

26 through CITY CAPITAL's  publicly-traded stock. Sadly, those representations were false and

27 DINISH has been forced to file this action to try to recoup her lost investment monies.

28

**PLAINTIFF KAUISHA SMITH INVESTS IN DEFENDANTS' PONZI SCHEMES**

167.   In January of 2009, SMITH invested approximately $42,000 through an EQUITY TRUST SDIRA in "oil" with City Petroleum, which was purportedly a division of CITY CAPITAL.

168.   SMITH had been invited to attend an investment seminar presented by TAYLOR at the Lakewood Church ("Lakewood") in Houston, Texas by a college friend of hers, Chris Lewis ("Lewis"), who worked for TAYLOR.  Lewis told SMITH that she should invest with TAYLOR because he was very successful and his investment companies were doing well.

169.   SMITH had just quit a state job and was going to be rolling over her state retirement account into another investment so she was interested in learning more about TAYLOR's investment opportunities through SDIRAs and was interested in using her state retirement funds to invest with TAYLOR's companies.

170.   Lewis recommended that SMITH invest in "oil" through City Petroleum which was a division of CITY CAPITAL since oil was a lucrative investment.  Lewis told SMITH that he had visited New York City with TAYLOR and other CITY CAPITAL employees and had visited  the "gas station that TAYLOR owned"  in New York. So SMITH was satisfied that the investment opportunity in "oil" that TAYLOR and CITY CAPITAL were offering was legitimate.

171.   TAYLOR's investment presentation at Lakewood emphasized the prosperity ministries doctrine that the attendees were people of God that God wanted to prosper and that the attendees would prosper if they invested in TAYLOR's investment programs.

172.   Also present at TAYLOR's presentation at the Lakewood Church seminar were CITY CAPITAL employees including Chris Lewis, Anthony Hall and Kinte Dixon.

173.   Based upon the recommendation of Lewis and the information SMITH learned at the Lakewood investment seminar, SMITH decided to roll over her state retirement plan monies into an EQUITY TRUST SDIRA and invest with TAYLOR and CITY CAPITAL.

174.   SMITH contacted CITY CAPITAL, and received from CITY CAPITAL, a completed EQUITY TRUST SDIRA application form that she was required to sign to make the investment in CITY CAPITAL through a SDIRA.  SMITH was told that EQUITY TRUST was the

SNYDER ♦ DORENFELD, LLP

1   only SDIRA Custodian that TAYLOR and CITY CAPITAL worked with.

2       175.    SMITH believes that Kinetra Dixon, a CITY CAPITAL employee, had completed

3   all of the information on her SDIRA application form including the information as to where

4   EQUITY TRUST was supposed to wire SMITH'S investment funds. All SMITH had to do was

5   execute the EQUITY TRUST SDIRA application form and then overnight it to EQUITY TRUST.

6   CITY CAPITAL even reimbursed SMITH for the cost of the overnight mailing charges to send her

7   SDIRA application to EQUITY TRUST.

8       176.    In return for her $42,000 investment, SMITH received a promissory note from

9   CITY CAPITAL with an annual interest rate of 15%.

10      177.    From January 2009 until at least December of 2011, SMITH'S EQUITY TRUST

11  SDIRA statements reflected that her SDIRA was valued at over $40,000. SMITH'S EQUITY

12  TRUST SDIRA statements however did not reflect that her CITY CAPITAL promissory note had

13  expired and was in default as of January 31, 2010 and that SMITH had never received any of the

14  investment interest that was due under her 2009 CITY CAPTIAL promissory note.

15      178.    In October of 2009, SMITH received a distressing phone call from Lewis.  On the

16  call, Lewis told SMITH that he and Anthony Hall were no longer working for CITY CAPITAL

17  and Lewis told SMITH that she should "make sure you call them (CITY CAPITAL) to get your

18  money."  Lewis was adamant with SMITH that she needed to move quickly and be persistent in

19  trying to get her investment monies back from CITY CAPITAL.  Lewis did not elaborate as to why

20  SMITH needed to act so quickly but SMITH realized that it must be serious if Lewis had quit his

21  job and was insisting she try to get her money back from CITY CAPITAL as quickly as possible.

22      179.    Thereafter, SMITH started emailing and calling CITY CAPITAL to try to reach

23  someone and find out what happened to her investment monies, get information and find out when

24  she could get her money back from CITY CAPITAL.

25      180.    In December of 2009, SMITH was supposed to receive the 15% interest payment on

26  her SDIRA investment monies pursuant to her 2009 CITY CAPITAL promissory note but she did

27  not receive anything nor did CITY CAPITAL deposit the investment interest into SMITH'S

28  EQUITY TRUST SDIRA.

SNYDER ◆ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                    30

1    181.   SMITH was eventually able to reach Kinetra Dixon at CITY CAPITAL after calling

2    numerous times and leaving numerous messages but Dixon referred SMITH to the CITY

3    CAPITAL "law department" that turned out to be Philadelphia lawyer Robert Bovarnick

4    ("Bovarnick").

5    182.   Dixon told SMITH to contact Bovarnick to find out when SMITH would receive her

6    investment interest from CITY CAPITAL as well as return of her investment monies since

7    Bovarnick was handling those issues on behalf of CITY CAPITAL. SMITH contacted Bovarnick

8    several times for assistance and information about her CITY CAPITAL investment monies but

9    SMITH never heard from Bovarnick.

10   183.   Then sometime in 2011, SMITH went on line and googled Taylor's name and saw

11   all of the posts from other investors of TAYLOR and TAYLOR's companies warning others that

12   TAYLOR and his investment schemes were fraudulent. SMITH then knew that her investment

13   money was gone even though her EQUITY TRUST SDIRA stated that her SDIRA was still worth

14   over $40,000.

15   184.   To this day, SMITH has never found out what happened to her SDIRA assets that

16   were held by EQUITY TRUST.  TAYLOR is now a fugitive and has been accused by the SEC and

17   other state securities regulators of running a multi-million dollar Ponzi scheme.

18   185.   Yet SMITH'S EQUITY TRUST statements year after year continued to reflect that

19   her SDIRA was valued at over $40,000 and never indicated that her promissory notes had expired

20   and/ or were in default.

21   186.   SMITH's SDIRA statements from EQUITY TRUST failed to accurately reflect the

22   fair market value of her SDIRA assets.  EQUITY TRUST also failed to disclose that her SDIRA

23   assets had been stolen by Taylor and become worthless and that the purported security for her

24   SDIRA assets was in default and no longer viable.  EQUITY TRUST also did not ascertain the

25   actual value of the SDIRA assets owned by SMITH and failed to report the actual value of her

26   SDIRA to the IRS as required by law.

27   187.   SMITH has filed this action after failing to obtain return of her investment monies

28   despite many promises by Defendants that SMITH'S monies would be returned and the receipt by

1  SMITH of multiple fraudulent settlement proposals from Defendants including purported offers to

2  give SMITH stock in CITY CAPITAL, in violation of applicable securities laws, in exchange for a

3  full release of any liability by Defendants.

4           **PLAINTIFF LARRY RUCKS INVESTS IN DEFENDANTS' PONZI SCHEMES**

5         188.    In early 2009, Plaintiff LARRY RUCKS was watching the Oprah Winfrey Show

6  when Defendant EPHREN TAYLOR appeared as a guest on Oprah's show.  In his interview with

7  Oprah, TAYLOR touted his status as a teenage millionaire as well as  his claim that he was the

8  youngest African American CEO of a publicly-traded company.  TAYLOR told Oprah that he was

9  a Christian and that he used his celebrity status to help others in need.

10         189.    TAYLOR also described for Oprah his "socially-conscious" investment strategies

11  through CITY CAPITAL, one of TAYLOR's publicly-traded companies. RUCKS was very

12  impressed with TAYLOR's interview on Oprah and later saw TAYLOR on Fox Financial Reports

13  as well as CNN telling the same story TAYLOR had told Oprah about his wealth, faith and

14  success.  RUCKS then found out TAYLOR was visiting African American churches around the

15  country doing investment presentations to show African Americans how to use their investment

16  monies to make good returns on their investments while also helping others. Being an African

17  American Christian and wanting to use his hard-earned investment monies to help others less

18  fortunate, RUCKS decided to invest with TAYLOR.

19         190.    RUCKS contacted CITY CAPITAL and spoke with CITY CAPITAL employees

20  Kinetra Dixon and Christopher Posey.  Dixon and Posey explained the CITY CAPITAL

21  investment process to RUCKS including providing RUCKS with information on how he could take

22  his current IRA and transfer it to EQUITY TRUST to set up a SDIRA which he could then use to

23  invest with CITY CAPITAL.

24         191.    RUCKS opened a SDIRA with EQUITY TRUST in July of 2009  to invest with the

25  CITY CAPITAL in a "socially conscious partnership" in Cleveland, Ohio whereby RUCKS'

26  SDIRA would acquire real property, CITY CAPITAL would rehabilitate the property for RUCKS,

27  CITY CAPITAL would lease the rehabilitated property for RUCKS and then CITY CAPITAL

28  would serve as the property manager for the leased property .

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

192.     RUCKS was advised that the cost to purchase this investment property in Cleveland was $19,565 and the cost to rehabilitate the property was $30,435.  RUCKS' projected return on investment through his EQUITY TRUST SDIRA was projected by CITY CAPITAL at 14% annually and CITY CAPITAL was to receive a 10% "Property Management Fee" once RUCKS' property was leased.  The projected annual cash flow on RUCKS' property was projected by CITY CAPITAL to be $7,020.

193.     Representatives of CITY CAPITAL also created a limited liability company for RUCKS named Cleveland Alpha Properties 507, LLC ("Cleveland Alpha") which was first identified in the EQUITY TRUST SDIRA application documents that CITY CAPITAL prepared and forwarded to RUCKS for signature. Like other clients of the CITY CAPITAL CONSPIRATORS, RUCKS did not have to complete any of the EQUITY TRUST SDIRA application documents. When RUCKS received the SDIRA application documents from CITY CAPITAL, all of the information had been completed-RUCKS just had to execute the documents where necessary.

194.     In the EQUITY TRUST SDIRA documents prepared by CITY CAPITAL for RUCKS, TAYLOR was named as the "Managing Partner" and "Managing Member" of Cleveland Alpha. RUCKS did not know what that meant for TAYLOR to have that title with his limited liability investment company but RUCKS trusted TAYLOR and the folks at CITY CAPITAL so he signed the EQUITY TRUST SDIRA documents and arranged to have $50,000 transferred from his IRA investment account to his EQUITY TRUST SDIRA account.

195.     EQUITY TRUST then wired $50,000 from RUCKS' SDIRA to the bank account number that had been provided to EQUITY TRUST by the CITY CAPITAL CONSPIRATORS.

196.     After several months went by, RUCKS tried to contact Posey and Dixon because he had not received any investment income in his SDIRA and had not heard from anyone at CITY CAPITAL about his investment.  RUCKS learned that Dixon and Posey were no longer with CITY CAPITAL.

197.     RUCKS found contact information for other CITY CAPITAL investors and contacted them only to learn that they, too, had not received investment income as promised and

---

1    could not reach anyone at CITY CAPITAL.  RUCKS then realized he had been duped.

2         198.    From July of 2009 when RUCKS first opened his EQUITY TRUST SDIRA until

3    the present, RUCKS' EQUITY TRUST SDIRA account statements have reflected a value of at

4    least $50,000.  The description of RUCKS' SDIRA investment is described on his EQUITY

5    TRUST SDIRA statements as simply "27905 Cleveland Alpha Prop 507 LLC Limited Liability

6    Corp."  There is no evidence or documentation showing that RUCKS' EQUITY TRUST SDIRA

7    ever held title to any property or ever received any investment income.

8         199.    To this day, RUCKS has never found out what happened to his SDIRA assets of at

9    least $50,000 that were held by EQUITY TRUST.  TAYLOR is now a fugitive and has been

10   accused by the SEC and other state securities regulators of running a multi-million dollar Ponzi

11   scheme.  RUCKS has never heard from EQUITY TRUST since he learned he was the victim of

12   the CITY CAPITAL CONSPIRATORS' Ponzi Scheme except when EQUITY TRUST has

13   attempted to collect their Custodial fees for his SDIRA based upon its stated value of $50,000.

14        200.    RUCKS' EQUITY TRUST SDIRA statements year after year continued to reflect

15   that his SDIRA was valued at over $50,000 and never indicated that he had not received any

16   investment interest, did not hold title to any property or hold assets of any kind in his SDIRA, and

17   that the LLC formed by CITY CAPITAL was defunct. RUCKS' SDIRA statements from EQUITY

18   TRUST failed to accurately reflect the fair market value of his SDIRA assets.  EQUITY TRUST

19   also failed to disclose that his SDIRA assets had been stolen by TAYLOR and become worthless

20   and that the purported security for his SDIRA assets was nonexistent.  EQUITY TRUST also did

21   not ascertain the actual value of the SDIRA assets owned by RUCKS and failed to report the actual

22   value of his SDIRA to the IRS as required by law.

23        201.    RUCKS has filed this action after failing to obtain return of his investment monies

24   despite many promises by Defendants that RUCKS' monies would be returned and the receipt by

25   RUCKS' of multiple fraudulent settlement proposals from Defendants including purported offers

26   to give RUCKS stock in CITY CAPITAL, in violation of applicable securities laws, in exchange

27   for a full release of any liability by Defendants.

28

SNYDER ◆ DORENFELD, LLP

---

CLASS ACTION COMPLAINT                                                                              34

**PLAINTIFF ROBERT BURKE INVESTS IN A PONZI SCHEME RUN BY TAYLOR AND TARGETING MEMBERS OF BURKE'S CHURCH**

202.    Plaintiff BURKE is 82 years old.

203.    Sometime in 2005, TAYLOR was invited to BURKE'S church, the Annapolis Park Church of Christ in Westland, Michigan where BURKE was a minister.

204.    At this investment presentation, TAYLOR was soliciting potential investors who were members of the church to form limited liability companies ("LLCs") to purchase houses in depressed areas, renovate the houses and then lease them to receive rental income.  TAYLOR's investment pitch also emphasized that by making this investment the church members, including BURKE, would help working class neighborhoods, single mothers and other Christians who were not as fortunate.

205.    TAYLOR told the church members that the houses to be renovated were in Kansas City and New York City and other cities BURKE does not recall.

206.    In August of 2005, BURKE took all of the money he had in cash out of his bank account, which was $10,000, and sent TAYLOR a check for the entire sum to make an investment in TAYLOR's Amoro Corp company in Missouri.

207.    TAYLOR then formed a Missouri LLC for BURKE called "R and M Christian Enterprises, LLC".

208.    After making the investment, BURKE did not hear from TAYLOR again and did not receive any investment income or interest on his investment from TAYLOR.

209.    BURKE tried to contact TAYLOR about the investment because he was not receiving any investment income.

210.    But BURKE could never reach TAYLOR to get any information about his investment or the property he invested in.

211.    Sometime later, TAYLOR contacted BURKE and told BURKE that TAYLOR was taking a company public and that TAYLOR was going to dissolve BURKE's LLC and transfer BURKE'S investment to publicly traded stock in a new company TAYLOR had become affiliated with, CITY CAPITAL.

212.    Thereafter BURKE received two CITY CAPITAL stock certificates dated October

SNYDER ◆ DORENFELD, LLP

1  | 23, 2006.

2  |     213.    BURKE never heard anything else from TAYLOR and never received any

3  | investment or interest income for his CITY CAPITAL stock.

4  |     214.    The last time BURKE heard about TAYLOR, TAYLOR was in North Carolina.

5  | BURKE tried to contact TAYLOR in North Carolina but was unable to do so.

6  |     215.    BURKE believes his CITY CAPITAL stock is probably worthless.

7  |     216.    To this day, BURKE has never found out what happened to the $10,000 he invested

8  | with TAYLOR.

9  |                **EQUITY TRUST WAS NOT A PASSIVE**
   |      **CUSTODIAN; RATHER, EQUITY TRUST ACTIVELY FACILITATED**
10 |                **MULTIPLE FRAUDULENT ENTERPRISES**

11 |     217.    The CITY CAPITAL CONSPIRATORS utilized the CITY CAPITAL

12 | AFFILIATED COMPANIES and investment vehicles to facilitate their Ponzi schemes.  Chief

13 | among the investment vehicles used was an SDIRA.  As discussed above, SDIRA rules permit

14 | investment in a much broader set of assets than are permitted by most IRA custodians.

15 | ("Custodians" or "trustees," the name given the manager/administrators of regular IRAs, are

16 | mainly banks and broker-dealers that restrict investment holdings in regular IRAs to approved

17 | stocks, bonds, mutual funds and CDs ( i.e., more traditional investments).

18 |     218.    However CUSTODIANS, though sharing similar but misleading names with CIRAs

19 | (custodian IRA's), deny any type of fiduciary responsibilities. In fact, as will be established herein,

20 | it is very, very difficult to ascertain exactly what CUSTODIANS claim to be responsible for, if

21 | anything, in "administering" SDIRAs.   It is even more difficult to rationalize how the

22 | CUSTODIANS' mystery "services" justify the exorbitant fees that EQUITY TRUST charged their

23 | customers including the Plaintiffs herein.

24 |     219.    The monies deposited into SDIRAs "administered" by EQUITY TRUST were

25 | stolen from Plaintiffs and the other Class members through fraud, Ponzi schemes, and other

26 | criminal conduct encouraged, facilitated, aided, abetted, promoted and consummated by the CITY

27 | CAPITAL CONSPIRATORS.

28 |     220.    EQUITY TRUST reported substantial increases in the value of each VICTIM'S

SNYDER ◆ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1   SDIRAs via IRS Form 5498 year after year when, in fact, the monies in the VICTIMS' SDIRAs

2   had already been stolen by the CITY CAPITAL CONSPIRATORS months or years before.

3       221.   EQUITY TRUST substantially assisted in the CITY CAPITAL CONSPIRATORS'

4   fraudulent schemes by mismanaging the Plaintiffs' SDIRA accounts and violating their own

5   internal policies.

6       222.   But for the CITY CAPITAL CONSPIRATORS' mandated, exclusive use of

7   EQUITY TRUST to "administer" the "investments" of Plaintiffs and other Class Members, the

8   retirement accounts and life savings of these VICTIMS would not have been stolen.

9       223.   EQUITY TRUST gave Plaintiffs and the other Class Members a false sense of

10  security by making false and deceptive representations that their "investments" would be safe,

11  insured, accurately administered, and legally sound.  Plaintiffs and the other Class Members,

12  relying on those representations, in good faith gave their hard-earned money to EQUITY TRUST

13  who enabled the CITY CAPITAL CONSPIRATORS to steal the VICTIMS' monies.  Most

14  investors lost their entire life savings.

15      224.   Although EQUITY TRUST charged excessive fees for their CUSTODIAN

16  "administrative services," EQUITY TRUST failed to perform one of the few "duties" they actually

17  concede exists for custodians which is to maintain custody of the paperwork proving ownership of

18  a designated asset by the SDIRA.

19      225.   From 2008 continuing to the present, EQUITY TRUST inaccurately reported

20  account values that concealed the CITY CAPITAL CONSPIRATORS' repeated defaults and

21  delinquent interest payments. EQUITY TRUST also continued to allow reinvestments in the CITY

22  CAPITAL CONSPIRATORS' securities even after learning that the CITY CAPITAL

23  CONSPIRATORS were engaged in the sale of unlawful securities.  EQUITY TRUST continued to

24  do so over the course of many months despite numerous detailed customer complaints alerting

25  EQUITY TRUST to serious problems with the investments.

26      226.   Many of the VICTIMS' SDIRA account statements reflected missing

27  documentation.  The SDIRA statements prepared by EQUITY TRUST contained notations year

28  after year that documentation reflecting ownership of the investment such as the original

CLASS ACTION COMPLAINT                                                    37

promissory note, an original collateral agreement, the LLC operating agreement, and/or a stock certificate evidencing ownership in some of the CITY CAPITAL AFFILIATED COMPANIES to name a few were never received and/or the LLC operating agreement was never received. Yet the EQUITY TRUST charged the VICTIMS administrative fees to manage their accounts yet still failed to follow up and obtain their own mandated paperwork for each investment account leaving many VICTIMS to ponder exactly where their money went and what it was used for.  Most VICTIMS to this day still do not know where their money went.

227.    EQUITY TRUST, through a myriad of nonsensical, confusing and overly complex illusory, adhesion contracts and documents, as well as false, misleading and deceptive advertising, diverted millions of dollars belonging to Plaintiffs and the other Class Members to the CITY CAPITAL CONSPIRATORS.

228.    EQUITY TRUST has publicly acknowledged the fact that they are aware that SDIRAs are and were used by fraud promoters to swindle their customers and that such fraud claims are escalating.

229.    Fraud promoters are acutely aware that their affiliation with and use of CUSTODIANS entice inexperienced investors, who might otherwise be more cautious, into an investment scam because the investors believe they are protected by large, purportedly well-funded CUSTODIANS with secure, trusting names like "Trust Company", "Trustee," or "Custodian."

230.    EQUITY TRUST attempted to disclaim responsibility for anything and everything. EQUITY TRUST utilized highly technical contracts which were full of unintelligible legalese. Such that even experienced lawyers would have trouble understanding such language. This was all being done while EQUITY TRUST was being paid handsomely to do nothing other than provide the means and method through which tens of thousands of people have been scammed of their life savings.

231.    EQUITY TRUST has acknowledged that although they claim to be a "passive" CUSTODIAN, they have stopped "allowing customers to invest" in some SDIRA programs upon discovering issues with the investment promoter that contradicts their purported status as a "passive" custodian.

SNYDER ♦ DORENFELD, LLP

232.    EQUITY TRUST knew that the CITY CAPITAL CONSPIRATORS were making the investment decisions for the Plaintiffs and other Class Members as well as paying the administrative fees of EQUITY TRUST at times EQUITY TRUST knew that the Plaintiffs' SDIRAs were being illegally controlled and managed by third parties-not the SDIRA account owners.

233.    The SEC issued an Investor Alert in September of 2011 warning consumers about the popularity of SDIRAs among fraud promoters particularly in Ponzi schemes.

234.    EQUITY TRUST has tried to limit their liability in their adhesion contracts to serve their best interests while at the same time facilitating criminal conduct directly resulting in the total loss of their customers' investments.

235.    Since at least 2005, it has been known in the CUSTODIAN industry that Ponzi schemers were utilizing SDIRAs to facilitate their criminal enterprises.  Yet, EQUITY TRUST has done nothing to detect, prevent, stop or warn their customers about this popular fraudulent investment scheme using SDIRA CUSTODIAN services even if EQUITY TRUST had actual knowledge of the Fraud promoter's fraudulent investment scheme .

236.    Fraud promoters, including Defendants herein, insisted and required that their VICTIMS, including Plaintiffs and the other Class Members, utilize SDIRAs administered by EQUITY TRUST because Defendants knew that the SDIRAs of the Plaintiffs and other Class Members were set up to automatically renew or "rollover" each year. The VICTIMS could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or "choose" to reinvest.

237.    In addition, Defendants knew that the investment interest that purportedly was being earned in the SDIRAs of Plaintiffs and the other Class Members "appeared" in the account statement of the VICTIMS' SDIRAs administered by EQUITY TRUST regardless of whether the accrued interest on the investment was actually deposited in the VICTIMS' accounts.  It was not for the majority of VICTIMS.

238.    The administration of the SDIRAs by EQUITY TRUST gave the illusion to

SNYDER ♦ DORENFELD, LLP

Plaintiffs that their SDIRAs were increasing in value and that their investments were profitable and legitimate. However, EQUITY TRUST failed to conduct a sufficient review of the SDIRAs of the VICTIMS to ascertain problems inherent with the accounts on their face.

239.    EQUITY TRUST periodically sent out investment account statements or made them available through the Internet to VICTIMS showing what appeared to be extraordinary investment returns in their SDIRAs thus maintaining the deception that the schemes of Defendants were providing high returns and that the value of the VICTIMS' SDIRAs was increasing.

240.    In fact, VICTIMS' investment monies were stolen within days or weeks after EQUITY TRUST  wired the funds to the CITY CAPITAL CONSPIRATORS.

241.    Under the plan documents of EQUITY TRUST, EQUITY TRUST had a duty to furnish periodic reports to the Plaintiffs concerning the status of their account and a statement of assets.  Instead EQUITY TRUST fraudulently concealed information that they had a duty to disclose i.e., that the securities held by the Plaintiffs' SDIRAs had defaulted and/or that the CITY CAPITAL CONSPIRATORS had failed to make distributions into their accounts.

242.    CUSTODIANS, such as EQUITY TRUST, are required to report the fair market value ("FMV") of the SDIRA assets annually on Form 5498 and to report  the value of any distributions to the SDIRA owner on Form 1099-R.  However,  EQUITY TRUST  failed and refused to ascertain the FMV of the SDIRAs owned by Plaintiffs and the other Class Members. Instead, EQUITY TRUST reported the same value year after year unless, of course, the CITY CAPITAL CONSPIRATORS provided a greater value to EQUITY TRUST who then recorded it as the updated value of the SDIRA thus further deceiving Plaintiffs and the other Class Members into believing their investments were increasing in value and secure.

243.    EQUITY   TRUST   had   actual   knowledge   that   the   CITY   CAPITAL CONSPIRATORS had defaulted on the securities held in the Plaintiffs and other Class Members SDIRAs while at the same time the CITY CAPITAL CONSPIRATORS were taking in new investors and investments. The CITY CAPITAL CONSPIRATORS started defaulting on the securities held by EQUITY TRUST by at least 2008 while the Ponzi schemes did not implode until late 2010.

244.   To enhance the appearance of legitimacy of their CUSTODIAN services, EQUITY TRUST sponsored Webinars about the safety, efficiency and profitability of investing in SDIRAs.

245.   EQUITY TRUST sponsored Webinars about investing in its SDIRAs featuring IRS agents as speakers.  Such marketing tactics were intended to lead consumers, including Plaintiffs and the other Class Members, to believe that the EQUITY TRUST'S services are validated and approved by the IRS.

246.   "IRS Approved" sales pitches are well known in investment circles and among securities regulators for being a frequently used method of investment advertising and marketing solicitation, designed to solicit consumers seeking IRA custodial services.

247.   EQUITY TRUST encouraged Plaintiffs and the other Members of the Class to utilize Limited Liability Companies ("LLC") to hold their SDIRA investments.

248.   Most state consumer protection laws require investment promoters to disclose in writing all relevant facts about both themselves and the offered investment. However, it is common knowledge among securities regulators that individuals promoting fraudulent investments favor LLCs or partnerships to hold investments to evade the consumer protection requirements of state and federal securities laws.

249.   If a person intent on committing fraud utilizes an LLC then they can hide personal bankruptcies and previous securities violations as well as avoid written disclosure of the investment risks, actual marketing costs, and their investment experience.

250.   EQUITY TRUST utilized deceptive and unfair trade practices as well as false and misleading advertising to entice consumers, including Plaintiffs and the other Class Members, to utilize their CUSTODIAN services with claims of attainment of new found riches and untold wealth.

251.   EQUITY TRUST failed to disclose that their SDIRAs were being used by fraud promoters to steal their customers' monies.   This omission of a material fact and/or active concealment by EQUITY TRUST caused Plaintiffs and other Class Members to invest in what they believed was a legitimate, profitable investment opportunity. Instead they invested in a Ponzi scheme or fraudulent enterprise designed to bilk the targeted investors.

SNYDER ♦ DORENFELD, LLP

252.   In addition, through use of substantive and procedurally unconscionable contracts, EQUITY TRUST and the other Defendants were able to utilize contracts of adhesion to bind Plaintiffs and the other Class Members to an illusory contract with no meaningful bargaining between the parties because of the economic disparity between the Plaintiffs and other Class Members and EQUITY TRUST.   Moreover, the VICTIMS were forced to use only the CUSTODIANS selected by the CITY CAPITAL CONSPIRATORS.

253.   The contracts of EQUITY TRUST are best described as contracts "such as no man in his sense and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Sears Termite & Pest Control, Inc. v. Robinson*, 883 So. 2d 153,158 (Ala. 2003).  But the VICTIMS had no choice.

254.   EQUITY TRUST permitted the CITY CAPITAL CONSPIRATORS to illegally control the investment accounts of the Plaintiffs and other Class Members.

255.   EQUITY TRUST enjoyed free marketing services by the CITY CAPITAL CONSPIRATORS who placed their name in marketing documents and e-mails to the VICTIMS detailing the fact that EQUITY TRUST was the ONLY custodian that managed SDRIAs for that particular fraudulent scheme.

256.   EQUITY TRUST aided, facilitated and supported the CITY CAPITAL CONSPIRATORS' control of the VICTIMS SDIRA accounts-so EQUITY TRUST could maintain a revenue stream of fees comprised of hundreds or thousands of dollars per year per account from each VICTIM for essentially doing nothing.

257.   EQUITY TRUST knew that the loans and notes in the VICTIMS' SDIRAs were defaulting repeatedly over multiple years but turned a blind eye.  EQUITY TRUST failed to accurately report the value of the SDIRAs of Plaintiffs and other Class Members resulting in the VICTIMS being unaware that their investment monies were been stolen although their SDIRAs appeared to be increasing in value.

258.   The IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD") from their retirement accounts annually, starting the year an investor turns age 70 1/2.  Thus the RMD requirement demands that retirement assets have

SNYDER ♦ DORENFELD, LLP

1  a certain degree of liquidity.  While RMDs may vary based on the ages of the investor and
2  beneficiary, as well as the rate of return earned on the investment, RMD amounts on most
3  retirement accounts are usually less than 1/20 of the principal in the retirement account.

4  259.   EQUITY TRUST knew that the investments of the Plaintiffs and other Class
5  Members who were over age 70 1/2 were completely illiquid and that the CITY CAPITAL
6  CONSPIRATORS  were breaching their duty to investors and mismanaging their investments
7  because the investment accounts of the VICTIMS frequently failed to maintain enough cash to pay
8  RMDs. In addition, because the value of the VICTIMS' SDIRA accounts were grossly inflated, so
9  were the RMD amounts subjecting EQUITY TRUST'S customers to greater penalties upon their
10 failure to take the distribution.

11 260.   In marketing documents, investment seminars, e-mail solicitations and other
12 advertising used to solicit potential investors such as the Plaintiffs and other Class Members, it was
13 repeatedly stated that the CITY CAPITAL AFFILIATED COMPANIES managed the investment
14 assets held by EQUITY TRUST.

15 261.   A "managed" account is very different from the legal definition of a SDIRA which
16 mandates that the investor makes all decisions about the account. Yet EQUITY TRUST, who
17 claimed to be passive, routinely took investment instructions from Defendants - not the VICTIMS.

18 262.    EQUITY TRUST knew that the funds in the SDIRAs of the VICTIMS were not
19 going to be used for their intended purpose yet did nothing.

20 263.   At all times material hereto, Defendant EQUITY TRUST knew or should have
21 known that the investment seminars, conference calls and presentations they were participating in
22 with TAYLOR and the other Defendants were illegal.

23 264.   At all times material hereto, Defendant EQUITY TRUST knew or should have
24 known that the investments being made by the Plaintiffs and other Class Members were illegal
25 either due to the fact that the investments themselves constituted an illegal enterprise (i.e.,
26 Sweepstakes machines) or due to the fact that the investment sponsors/brokers/promoters, the
27 CITY CAPITAL CONSPIRATORS and the CITY CAPITAL AFFILIATED COMPANIES were
28 neither licensed nor registered in any state to sell the investment or give investment advice as

1   required by state and Federal securities laws.

2       265.    EQUITY TRUST knew or should have known that the written investment

3   solicitation documents given the Plaintiffs and other Class Members falsely indicated that the

4   SDIRAs of the VICTIMS were insured by the FDIC.

5       266.    EQUITY TRUST knew or should have known the written investment solicitation

6   documents given the Plaintiffs and other Class Members falsely stated that the promissory notes in

7   the SDIRAs of the VICTIMS were secured by tangible assets. This statement was blatantly false

8   and in fact EQUITY TRUST knew or should have known that there was no documentation

9   evidencing that the VICTIMS' investments were secured by tangible assets.

10      267.    EQUITY TRUST failed to act in accordance with industry standards to maintain

11  custody over, hold, preserve and safeguard the SDIRA assets of Plaintiffs and the other Class

12  Members; failed to maintain title of the assets in the SDIRAS; and failed to furnish legally

13  mandated statements accurately reflecting the value of the assets held in the SDIRAs of the

14  VICTIMS.

15      268.    EQUITY TRUST failed to act in accordance with applicable regulatory

16  requirements in the conduct of their duties as SDIRA CUSTODIANS.

17      269.    On information and belief, EQUITY TRUST failed and/or refused to comply or

18  abide by the regulatory requirements applicable to Custodians of SDIRAs in the rendition of their

19  services as Custodian to Plaintiffs and the Class Members.

20      270.    At all times material hereto, EQUITY TRUST had actual knowledge of their

21  complicit involvement in a highly organized Ponzi scheme and/or was recklessly or willfully blind

22  to their role in materially supporting the scheme.

23      271.    On April 4, 2012, the Better Business Bureau ("BBB") suspended the BBB

24  accreditation of EQUITY TRUST due to its repeated failure to address consumer complaints about

25  service issues and the failure to respond to specific consumer complaints which demonstrated a

26  pattern of unacceptable conduct. EQUITY TRUST attempted on April 19, 2012 to persuade the

27  BBB to lift the suspension, however, the BBB refused and has indicated that the suspension will

28  remain in effect for at least six months.

SNYDER ♦ DORENFELD, LLP

272.   Upon information and belief, although EQUITY TRUST classifies itself as a "Passive Custodian," the conduct of EQUITY TRUST appears to fall outside of a Passive Custodian role.

273.   Upon information and belief, EQUITY TRUST acted outside of a Passive Custodian capacity by: jointly marketing their SDIRA custodial services with the other CITY CAPITAL CONSPIRATORS; running background checks on investment promoters including TAYLOR but failing and refusing to disclose the results of the background checks to their affected customers even if EQUITY TRUST determined that the investment scheme that their customers were investing in through SDIRAs was a fraud such as they did with TAYLOR; and continuing to process new investments through SDIRAs with the CITY CAPITAL CONSPIRATORS even though EQUITY TRUST had actual knowledge that the TAYLOR-controlled investments were fraudulent investment schemes.

274.   EQUITY TRUST permitted the CITY CAPITAL CONSPIRATORS to provide the FMV of the assets of the SDIRAs of their VICTIMS, but once the fraudulent scheme was exposed EQUITY TRUST required the CITY CAPITAL CONSPIRATORS' VICTIMS to provide third party proof that their SDIRA investment with CITY CAPITAL was worthless and refused to modify the value of the VICTIMS' SDIRAs unless the VICTIM paid the EQUITY TRUST's administrative fees.

275.   EQUITY TRUST'S acts and/or omissions in assisting, facilitating and participating in the Ponzi schemes of the CITY CAPITAL CONSPIRATORS render EQUITY TRUST as a direct and proximate cause of the Plaintiffs' losses and therefore EQUITY TRUST is liable for the damages incurred by Plaintiffs and other Class Members herein.

## DEFENDANTS' FRAUDULENT SCHEMES CONTINUE

276.   The CITY CAPITAL CONSPIRATORS continued to illegally solicit and sell investments even after their Ponzi scheme fell through.   Through Global Sweepstakes and Investment Properties LLC, a North Carolina limited liability company, Defendants continued to sell sweepstakes machines and investments in real property.

277.   TAYLOR was still sending solicitation e-mails to the VICTIMS in December of

SNYDER ♦ DORENFELD, LLP

1    2010, trying to get VICTIMS to invest in new schemes TAYLOR had designed. In fact, the day

2    after TAYLOR allegedly resigned from CITY CAPITAL as CEO, he sent solicitation e-mails to

3    some of the VICTIMS soliciting further investments on behalf of CITY CAPITAL and the rest of

4    the CITY CAPITAL CONSPIRATORS.

5         278.   Plaintiffs do not believe TAYLOR ever truly stepped down or relinquished control

6    of the CITY CAPITAL AFFILIATED COMPANIES and believe the CITY CAPITAL

7    CONSPIRATORS, LIPINSKI and MACINTYRE were or are still operating Ponzi schemes

8    through illegal investments to this day.

9         279.   In October of 2011, TAYLOR, CITY CAPITAL, BATT and EQUITY TRUST,

10   among others, were sued for illegal sale of securities and fraud in state court in Dekalb County,

11   Georgia (Case No. 1/A39373-5) by 10 members of the New Birth  Missionary Baptist Church

12   ("New Birth") who alleged that they had invested over $1 million with TAYLOR and the

13   TAYLOR-controlled entities after TAYLOR preached and held an investment seminar at the New

14   Birth Church in 2009.  That case is still pending.

15        280.   In February of 2012, LIPINSKI and MACINTYRE,  on behalf of  CITY CAPITAL,

16   issued a press release indicating that Legal Outsourcing Group LLC ("LOG") had been retained to

17   "separate and address the old liabilities and contingencies of CITY CAPITAL CORPORATION."

18   This press release was issued by LIPINSKI and MACINTYRE to attempt to placate the VICTIMS

19   and dissuade them from moving forward with litigation against TAYLOR, ERX and CITY

20   CAPITAL. After that, the VICTIMS started receiving phone calls and e-mails from someone

21   claiming to be a representative of LOG scheduling a time to discuss their "settlement" of claims

22   against CITY CAPITAL and the other TAYLOR-controlled shell companies. These purported

23   settlements were and are an extension of the fraudulent schemes perpetrated by the CITY

24   CAPITAL CONSPIRATORS and facilitated by LIPINISKI and MACINTYRE to the present time.

25   To "settle," the VICTIMS were required to sign releases and waivers of all liability and, in return,

26   would receive shares of stock in CITY CAPITAL that were worthless, unmarketable and illegally

27   issued (something known by Defendants but unknown by the VICTIMS).

28        281.   LIPINSKI, MACINTYRE and the CITY CAPITAL CONSPIRATORS failed to

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                                    46

SNYDER ♦ DORENFELD, LLP

1    disclose to the victims that trading in CITY CAPITAL stock was halted by the SEC on April 13,

2    2012, due to the fact that CITY CAPITAL had not filed any periodic reports with the SEC since its

3    delinquent 2009 Form 10-K was filed on June 15, 2010 yet CITY CAPITAL and the CITY

4    CAPITAL AFFILIATED COMPANIES continued to sell securities.

5            282.    The CITY CAPITAL CONSPIRATORS, LIPINSKI and MACINTYRE in 2012

6    continued to perpetuate the fraudulent scheme of the CITY CAPITAL CONSPIRATORS on the

7    VICTIMS through their purported transfer of illegal, unregistered securities as consideration for a

8    release and hold harmless agreement to be executed by the VICTIMS that would waive all legal

9    rights of the VICTIMS to pursue their claims against Defendants for investment fraud resulting

10   from the sale of unregistered securities by unlicensed agents of Defendants.

11           283.    However, sometime later in 2012, LOG had to take down its website because of all

12   of the threats LOG received due to its participation in the TAYLOR/CITY CAPITAL settlement

13   process scam wherein LOG was purportedly resolving investment losses per the direction of

14   LIPINSKI and MACINTYRE and the CITY CAPITAL CONSPIRATORS through a settlement

15   plan that violated applicable securities law.

16           284.    On March 29, 2012, the Securities Division of the North Carolina Department of the

17   Secretary of State issued a Final Order to Cease and Desist against Ephren W. Taylor, City Capital

18   Corporation, City Laundry Services, LLC, City Petroleum, LLC, and Clean Sweeps Holdings

19   Group, LLC (collectively "Respondents"). The Final Order to Cease and Desist permanently

20   ordered that Respondents shall cease and desist from offering for sale, soliciting offers to purchase

21   or selling, in or from North Carolina, any securities, including but not limited to the securities of

22   City Capital Corporation, City Laundry Services, LLC, City Petroleum, LLC, and Clean Sweeps

23   Holdings Group, LLC. The Final Order to Cease and Desist found that Ephren W. Taylor was not

24   licensed to sell securities in North Carolina and that City Capital Corporation, City Laundry

25   Services, LLC, City Petroleum, LLC, and Clean Sweeps Holdings Group, LLC employed

26   unlicensed salespersons to offer and sell their securities, in violation of the North Carolina

27   Securities Act. The Final Order to Cease and Desist also permanently ordered Respondents to

28   cease and desist from making untrue statements of a material fact and omitting to state material

1    facts in connection with the offer, sale or purchase of any security.

2                    **V.   CLASS ACTION ALLEGATIONS**

3          285.    Plaintiffs bring this action on their behalf and as a class action pursuant to Rules

4    23(a) & (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and/or entities who

5    purchased and owned any "investment" offered, sold, solicited or consummated by the CITY

6    CAPITAL CONSPIRATORS in CITY CAPITAL AFFILIATED COMPANIES from January 1,

7    2006 until the present day (the "Class Period") and who suffered damages as a result (the "Class").

8          286.    Plaintiffs also bring this action on behalf of a subclass (the "California Subclass")

9    defined as all California residents who purchased and owned any "investment offered, sold,

10   solicited or consummated by the CITY CAPTIAL CONSPIRATORS in CITY CAPITAL

11   AFFILIATED COMPANIES from January 1, 2006 until the present day and who suffered

12   damages as a result.

13         287.    The members of the Class, purchasers of Defendants' investments during the Class

14   Period, are so numerous that joinder of all members is impracticable.  While the exact number of

15   Class Members can only be determined by appropriate discovery, Plaintiffs believe that the Class

16   Members total over 500 and may be in excess of 1,000.

17         288.    Plaintiffs' claims are typical of the claims of members of the Class.  Plaintiffs and

18   all members of the Class sustained damages as a result of conduct alleged herein, including but not

19   limited to fraud, negligence, conversion, breach of fiduciary duty, and state and federal securities

20   violations and other malfeasance as specified herein. Plaintiffs and the Class Members will be

21   referred to collectively herein as "VICTIMS."

22         289.    Plaintiffs will fairly and adequately protect the interest of the members of the Class

23   and have retained counsel competent and experienced in class action litigation.  Plaintiffs have no

24   interests that are contrary to or in conflict with those of the members of the Class that Plaintiffs

25   seek to represent.

26         290.    A class action is superior to other methods for the fair and efficient adjudication of

27   this controversy.  The damages suffered by individual Class Members may be relatively small,

28   some as little as $5,000; therefore the expense and burden of individual litigation make it virtually

SNYDER ♦ DORENFELD, LLP

_____

1   impossible for the Class Members individually to seek redress for the wrongful conduct alleged

2   herein.

3       291.    Common questions of law and fact exist as to all members of the Class and

4   predominate over any questions solely affecting individual Class Members. Among the questions

5   of law and fact common to the Class are:

6       a.      Whether the CITY CAPITAL CONSPIRATORS breached legal and

7           fiduciary duties to the Plaintiffs;

8       b.      Whether Defendants failed to disclose material conflicts of interests to the

9           Plaintiffs;

10      c.      Whether the investment vehicles sold by CITY CAPITAL

11          CONSPIRATORS constituted "securities" under federal and state securities law;

12      d.      Whether CITY CAPITAL CONSPIRATORS' conduct violated the federal

13          securities laws;

14      e.      Whether CITY CAPITAL CONSPIRATORS offered and sold unregistered

15          securities;

16      f.      Whether Defendants' statements to the investing public during the Class

17          Period materially misrepresented the business and financial condition of the CITY

18          CAPITAL AFFILIATED COMPANIES;

19      g.      Whether the members of the Class have sustained damages as a result of the

20          misconduct complained of herein, and, if so, the appropriate measure thereof;

21      h.      Whether Defendants' conduct constitutes financial elder abuse; and

22      i.      Whether Defendants' conduct constitutes unfair competition.

23      292.    Plaintiffs know of no difficulty that will be encountered in the management of this

24   litigation that would preclude its maintenance as a class action.

25      293.    The names and addresses of Defendants' customers and investors who purchased

26   "investments" during the Class Period are obtainable from information in the possession of

27   Defendants and/or their agents.  Notice can be provided to such owners via first class mail or e-

28   mail using techniques and a form of notice similar to those customarily used in class actions.

SNYDER ◆ DORENFELD, LLP

---

CLASS ACTION COMPLAINT                                                    49

SNYDER ♦ DORENFELD, LLP

**COUNT I**

**CONVERSION**

(Against all Defendants)

294.    Plaintiffs incorporate the allegations contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

295.    This is a claim for conversion.

296.    As described more fully above, the "investment" programs of Defendants that Plaintiffs and the other Class Members invested in were fraudulent.  Defendants were operating a series of Ponzi schemes which permitted Defendants to exercise unauthorized dominion and control over the property of Plaintiffs and the other Class Members when they absconded with the Plaintiffs' and other Class Members' money.  Defendants took and appropriated that money for their own use.

297.    Defendants' conversion has permanently deprived Plaintiffs and the other Class Members of their property.

298.    Plaintiffs and other Class Members have repeatedly demanded, and were promised by Defendants, that their funds would be returned but Defendants did not in fact return them.

299.    Defendants' actions have directly caused injury and damages to Plaintiffs and the Class Members.

**COUNT II**

**INTENTIONAL FRAUD**

(Against all Defendants)

300.    Plaintiffs incorporate the allegations contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

301.    The CITY CAPITAL CONSPIRATORS, LIPINSKI and MACINTYRE made several misrepresentations to the public at large and to the Plaintiffs and the Class Members as set forth above.

302.    These Defendants knew that these statements were false when they made them.

303.    Defendants intended for Plaintiffs and the Class Members to rely upon their false

1    statements.

2        304.   Plaintiffs and the Class Members did in fact rely on these Defendants' false

3    statements, and would never have invested in the CITY CAPITAL AFFILIATED COMPANIES

4    were it not for the false statements.

5        305.   These Defendants have enjoyed substantial financial gain, and Plaintiffs and the

6    other Class Members have suffered severe financial loss as a result of the reliance of Plaintiffs and

7    other Class Members on these false statements.

8                              **COUNT III**

9                     **NEGLIGENT MISREPRESENTATION**

10                         (Against all Defendants)

11        306.   Plaintiffs incorporate the allegations contained in all the prior paragraphs of this

12    Complaint as if restated and fully set forth herein.

13        307.   The CITY CAPITAL CONSPIRATORS, LIPINSKI and MACINTYRE made

14    several misrepresentations to the public at large and to the Plaintiffs and the Class Members as set

15    forth above.

16        308.   These Defendants should have known that these statements were false when they

17    made them.

18        309.   These Defendants intended for Plaintiffs and the Class Members to rely upon their

19    false statements.

20        310.   Plaintiffs and the Class Members did in fact rely on these Defendants' false

21    statements, and would never have invested in CITY CAPITAL were it not for the false statements.

22        311.   These Defendants have enjoyed substantial financial gain, and Plaintiffs and the

23    other Class Members have suffered severe financial loss as a result of Plaintiffs' and Class

24    Members' reliance on false statements.

25                              **COUNT IV**

26                     **BREACH OF FIDUCIARY DUTY**

27                         (Against all Defendants)

28        312.   Plaintiffs incorporate the allegations contained in all the prior paragraphs of this

SNYDER ◆ DORENFELD, LLP

1   Complaint as if restated and fully set forth herein.

2        313.    At all times material hereto, the CITY CAPITAL CONSPIRATORS, LIPINSKI and

3   MACINTYRE owed the Plaintiffs and the other Class Members a fiduciary duty for reasons

4   including, but not limited to, Defendants held themselves out as investment advisors and

5   custodians to Plaintiffs and the other Class Members, and the fact that they purported to serve

6   Plaintiffs and the other Class Members as competent custodians of their investments and as

7   participants in a common investment scheme.

8        314.    These Defendants breached their fiduciary duties through their actions by methods

9   including but not limited to:

10              a.      Investing the Plaintiffs and other Class Members' money in a Ponzi

11              scheme or schemes;

12              b.      Working together to perpetuate the false notion that TAYLOR was a

13              successful, multimillionaire and would help Plaintiffs make double or triple

14              their ROI;

15              c.      Mismanaging the CITY CAPITAL investments;

16              d.      Issuing inaccurate account statements that concealed repeated

17              defaults on the promissory notes that the EQUITY TRUST' clients,

18              including the Plaintiffs and member of the Class had purchased;

19          e.   Claiming to be in the process of providing a legal remedy to the VICTIMS

20              and making the VICTIMS whole through a trust resolution process, which

21              violated applicable securities law, whereby the VICTIMS would receive

22              CITY CAPITAL stock that could be sold in the public stock market and

23              permit the VICTIMS to recoup their investment losses through the CITY

24              CAPITAL AFFILIATED COMPANIES;

25              f.      Overcharging the Plaintiffs and other Class Members for their

26              services; withdrawing funds from CITY CAPITAL for personal use; and

27              g..     By profiting from these things at Plaintiffs and other Class Members'

28              expense.

SNYDER ♦ DORENFELD, LLP

---

CLASS ACTION COMPLAINT                                                           52

315.    As a result of Defendants' wrongful conduct, Plaintiffs and the other Class Members have suffered and will continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**COUNT V**

**UNFAIR COMPETITION UNDER CALIFORNIA**
**BUSINESS AND PROFESSIONS CODE § 17200 *et seq*.**

(Against all Defendants)

316.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

317.    Plaintiff Rucks asserts this claim against all Defendants on behalf of himself, the California Subclass and the general public.

318.    California Business and Professions Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

319.    This private Attorney General action is brought by the Plaintiff Rucks to remedy violations of California's state consumer protection statutes arising out of Defendants' and/or their representatives' misrepresentations, omissions of material facts, and breaches of agreements.

320.    Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California Business and Professions Code § 17200 *et seq*.

321.    This is a private Attorney General action brought on behalf of the general public. As detailed herein, Defendants have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations.

322.    Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving" investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by Defendants without regard to the legal and equitable rights of Plaintiff Rucks or the California Subclass Members constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's

SNYDER ♦ DORENFELD, LLP

1    Unfair Competition Law.

2        323.    Defendants' conduct is of a continuing nature that requires prompt relief.

3    Defendants have uniformly represented to the general public through their representatives that their

4    actions were legally appropriate when in fact they were not and/or have concealed material facts

5    (as detailed throughout this Complaint); and the disclosure of such information was necessary to

6    make Defendants' other representations not misleading for want of disclosure of such omitted facts

7    or because Defendants possess superior knowledge of the true facts.

8        324.    Plaintiff Rucks and the California Subclass Members have suffered, and continue to

9    suffer, actual injury in fact due to the willful acts of Defendants that are contrary to the public

10   policy of California, are substantially injurious to consumers of California and constitute unfair

11   trade practices and competition under Section 17200, *et seq.* of the California Business and

12   Professions Code.

13       325.    Defendants' actions discussed herein constitute unfair competition within the

14   meaning of California Business and Professions Code § 17200.

15       326.    As a result of Defendants' conduct as described herein, Plaintiff Rucks and the

16   California Subclass Members were subjected to unlawful, unfair and/or fraudulent treatment and

17   Defendants were unjustly enriched and should be ordered to pay restitution pursuant to Business

18   and Professions Code §§ 17203 and 17204.

19       327.    Members of the general public also face irreparable harm, such as, *inter alia*, not

20   being fully informed of the true facts and, not having the full value of any monies wrongfully

21   received or saved provided to them.

22       328.    Equitable relief is appropriate to ensure adequate controls are in place to remedy the

23   wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what

24   transpired.  Pursuant to California Business and Professions Code § 17203, Plaintiff Rucks and the

25   California Subclass Members are entitled to preliminary and permanent injunctive relief ordering

26   Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits

27   associated with this unfair competition.

28       329.    Plaintiff Rucks and the California Subclass Members seek an order from this Court

prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiff Ruck and the California Subclass Members all monies owed them as alleged in this Complaint.

330.   Plaintiff Rucks and the California Subclass Members additionally request an order from this Court requiring that Defendants make restitution of profits and return or pay to Plaintiff Ruck and the California Subclass Members all of Defendants' ill-gotten gains obtained from its illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had Defendants complied with their legal obligations, or, as equity requires.

331.   The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Defendants continue to this day and/or present a threat of irreparable harm to the general public. Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

332.   Pursuant to California Business & Professions Code §17203, Plaintiff Rucks, on behalf of the general public and the California Subclass Members, seek a temporary, preliminary and/or permanent order from this Court prohibiting Defendants from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering Defendants or their representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by Defendants' and/or their representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

333.   Plaintiff Rucks and the California Subclass Members further request a court order that an asset freeze or constructive trust be imposed over all monies in Defendants' possession which rightfully belong to Plaintiff Ruck and the California Subclass Members.

334.   Plaintiff Rucks requests judgment and restitution from Defendants in an amount to be proven at trial for unfair, fraudulent and illegal business practices, damages, statutory penalties, and attorney's fees (pursuant to the Unfair Competition Law and the private Attorney General

SNYDER ♦ DORENFELD, LLP

1    statute) together with court costs.

2        335.    Pursuant to California Business and Professions Code § 17203,  Plaintiff Rucks and

3    the California Subclass Members are entitled to preliminary and permanent injunctive relief

4    ordering Defendants to cease this unfair competition and the conduct alleged herein, as well as

5    disgorgement of all of Defendants' profits associated with this unfair competition.

6        336.    Defendants' deliberate acts of fraud and misrepresentation accomplished through

7    Ponzi schemes involving "investments" in illegal gambling activities, shell companies and ghost

8    investment vehicles orchestrated by Defendants without regard to the legal and equitable rights of

9    Plaintiff Rucks and the California Subclass Members constitute acts of unlawful, unfair or

10   deceptive business acts and practices that are injurious to the public within the meaning of

11   California's Unfair Competition Law.

12       337.    Plaintiff Rucks and the California Subclass Members seek an order from this Court

13   prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive

14   business acts or practices set forth in this Complaint and/or ordering that Defendants perform their

15   obligations under the law and reimburse Plaintiffs and the Class Members all monies owed them as

16   alleged in this Complaint.

17                                   **COUNT VI**

18                                   **NEGLIGENCE**

19                            (Against EQUITY TRUST)

20       338.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this

21   Complaint as if restated and fully set forth herein.

22       339.    EQUITY TRUST owed Plaintiffs a duty of ordinary and reasonable care which

23   arises from their relationships with them and their position and status.

24       340.    EQUITY TRUST also owed Plaintiffs and Class Members duties of ordinary and

25   reasonable care applicable to banks and financial institutions holding custody of customer's assets

26   and accounts, as well as just and equitable principals of their respective trades.  EQUITY TRUST

27   breached their duties owing to Plaintiffs and the Class Members.

28       341.    Defendants breached their obligations to Plaintiffs and Class Members by and

SNYDER ♦ DORENFELD, LLP

through their:

a.      Failure to maintain actual custody of funds;

b.      Failure to perform sufficient due diligence to safeguard and ensure the existence and continued existence of Plaintiffs' funds;

c.      Failure to perform sufficient due diligence to ensure that account statements sent to Plaintiffs did not report false and deceptive asset "values"; and

d.      Failure to disclose material facts to Plaintiffs and the other Class Members.

342.    As a result of Defendants' wrongful conduct, Plaintiffs and the other Class Members have suffered and will continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

COUNT VII

FRAUDULENT CONCEALMENT

(Against all Defendants)

343.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

344.    This is a claim for fraudulent concealment.

345.    As described more fully above, Defendants were operating Ponzi schemes through the CITY CAPITAL AFFILIATED COMPANIES.

346.    In furtherance of the Ponzi schemes, Defendants knowingly made material false statements and representations, including but not limited to representing that Defendants' investment programs were legal, legitimate, licensed and registered, delivered two or three times the return on investment of normal investments, that Defendants' investment programs were "guaranteed" and that Defendants through the CITY CAPITAL AFFILIATED COMPANIES had the financial assets to back up the guarantees made by Defendant.

347.    Defendants intended for Plaintiffs to act on their knowingly false representations.

348.    Plaintiffs in fact relied on these false representations to their detriment.

349.    Plaintiffs' reliance upon Defendants' representations was justifiable given the Plaintiffs' lack of knowledge of their falsehood.

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1    350.   As a direct and proximate result of Defendants' false statements, Plaintiffs have

2  sustained damages.

3                                    **COUNT VIII**

4               **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

5                               (Against EQUITY TRUST)

6    351.   Plaintiffs incorporate the allegations contained in all prior paragraphs of this

7  Complaint as if restated and fully set forth herein.

8    352.   The CITY CAPITAL CONSPIRATORS having rendered investment advice to the

9  Plaintiffs and other Class Members were themselves fiduciaries owing a duty of care to the

10  Plaintiffs and other Class Members.

11   353.   EQUITY TRUST had knowledge of the investment fraud being perpetrated through

12  the CITY CAPITAL AFFILIATED COMPANIES and rendered substantial assistance in their

13  fraudulent conduct.

14   354.   As a result of the conduct of EQUITY TRUST in aiding and abetting the fraud

15  perpetrated by the CITY CAPITAL CONSPIRATORS and the CITY CAPITAL

16  CONSPIRATORS' breaches of fiduciary duties, the fraudulent enterprises of the CITY CAPITAL

17  AFFILIATED COMPANIES were allowed to grow and flourish, causing all Plaintiffs to suffer

18  damages, with interest thereon, in an amount to be determined at trial.

19                                    **COUNT IX**

20               **AIDING AND ABETTING COMMON LAW FRAUD**

21                               (Against EQUITY TRUST)

22   355.   Plaintiffs incorporate the allegations contained in all prior paragraphs of this

23  Complaint as if restated and fully set forth herein.

24   356.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though

25  fully set forth herein.

26   357.   EQUITY TRUST had knowledge of the fraud being committed by the CITY

27  CAPITAL AFFILIATED COMPANIES and rendered substantial assistance to the CITY

28  CAPITAL AFFILIATED COMPANIES in their fraudulent conduct.

CLASS ACTION COMPLAINT                                                              58

358.     As a result of the conduct of EQUITY TRUST in aiding and abetting the CITY CAPITAL AFFILIATED COMPANIES, the fraud of the CITY CAPITAL CONSPIRATORS was allowed to flourish, and all Class Members suffered damages, with interest thereon, in an amount to be determined at trial.

## COUNT X

### VIOLATIONS OF EXCHANGE ACT SECTION 10 (b) and RULE  10b-5

(Against all Defendants)

359.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

360.     During the Class Period alleged herein, Defendants have employed schemes, and devices to make material and misleading statements of fact, and have omitted to state material facts necessary to make the statements made, in the light of the circumstances in which they were made, not misleading; and

361.     Defendants have engaged in practices and a course of business that has operated as a fraud and deceit upon all Class Members.

362.     Defendants knowingly or with deliberate recklessness, engaged in the violations of the federal securities law described herein, and they knowingly, or with deliberate recklessness made the misstatements alleged herein.

363.     The Class Members reasonably relied on Defendants' statements and purchased unregistered securities and now have suffered great financial loss because of that reliance.

## COUNT XI

### VIOLATIONS OF SECURITIES ACT SECTION 5 (a)

(Against all Defendants )

364.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

365.     From at least January 1, 2006 through the present, Defendants directly and indirectly, singly and in concert, have, and unless enjoined will continue to abuse the instrumentalities of interstate commerce to offer and sell unregistered securities in unexempt

SNYDER ◆ DORENFELD, LLP

1   offerings to the general public.

2        366.    Plaintiffs and other Class Members have sustained damages as a result of this illegal

3   activity.

4                                    **COUNT XII**

5                                 **FAILURE TO WARN**

6                                   (EQUITY TRUST )

7        367.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this

8   Complaint as if restated and fully set forth herein.

9        368.    EQUITY TRUST knew or should have known that their SDIRAs were being used

10  by fraud promoters to perpetuate Ponzi Schemes and other fraudulent enterprises on their

11  customers, including Plaintiffs and the other Class Members, resulting in the total loss of their

12  customers' SDIRAs to fraud promoters.

13       369.    When a financial services provider determines, or pursuant to the standards of its

14  profession should determine, that utilization of its services may result in the substantial loss of its

15  customers' investment funds, the financial services advisor incurs an obligation to use reasonable

16  care to protect the intended victim/customer against such danger.

17       370.    The discharge of this duty may require the financial services advisor to take one or

18  more of various steps, depending upon the nature of the case. Thus the financial services advisor

19  may be required to warn the intended victim/customer or others likely to apprise the customer of

20  the danger, or to notify the proper authorities, or to take whatever other steps are reasonably

21  necessary under the circumstances.

22       371.    Despite having actual notice of this danger, EQUITY TRUST breached their duty of

23  care by failing and refusing to warn Plaintiffs and other Class Members.

24       372.    As a direct and proximate result, Plaintiffs and other Class Members have sustained

25  damages as set forth herein.

26

27

28

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

## COUNT XIII

## CONSTRUCTIVE TRUST

(Against all Defendants)

373.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

374.    Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each Defendant sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency and employment.

375.    As a proximate result of Defendants' fraudulent and/or negligent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiffs have sustained damages.

376.    By reason of the fraudulent and otherwise wrongful manner in which Defendants obtained their alleged right, claim or interest in and to the property, Defendants, each of them, have no legal or equitable right, claim or interest therein.

377.    Instead, Defendants, and each of them, are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs with the duty to convey the same to Plaintiffs forthwith.

## COUNT XIV

## VIOLATION OF SECTIONS 25401/25501 OF THE CALIFORNIA CORPORATIONS CODE

(Against all Defendants)

378.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

379.    Plaintiff Rucks asserts this claim against all Defendants on behalf of himself and the California Subclass.

380.    Each Defendant offered to sell or sold securities by means of written and oral communications which included untrue statements of material fact or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made,

1    not misleading.

2        381.    Each Defendant knew or in the exercise of reasonable care should have known of

3    the misrepresentations made by them.

4        382.    Plaintiff Rucks and the California Subclass Members did not know the truth

5    regarding Defendants' misrepresentations and/or omissions.

6        383.    By reason of the foregoing, Defendants named herein violated section 25401 of

7    California Corporations Code, thereby entitling Plaintiff Rucks and the California Subclass

8    Members to recover damages pursuant to section 25501 of California Corporations Code.

9        384.    Plaintiff Rucks and the California Subclass Members are entitled to compensatory

10   and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys

11   General.

12                                   **COUNT XV**

13                  <u>**VIOLATION OF SECTIONS 25402/25502 OF THE**</u>
                    <u>**CALIFORNIA CORPORATIONS CODE**</u>

14

15                          (Against Individual Defendants Only)

16       385.            Plaintiffs incorporate the allegations contained in all prior paragraphs of this

17   Complaint as if restated and fully set forth herein.

18       386.    Plaintiff Rucks asserts this claim against all Defendants on behalf of himself and the

19   California Subclass.

20       387.    The Individual Defendants are owners, officers and/or directors and controlling

21   persons of the CITY CAPITAL AFFILIATED COMPANIES, whose relationships to the CITY

22   CAPITAL AFFILIATED COMPANIES give them access to material information about the CITY

23   CAPITAL AFFILIATED COMPANIES not generally provided to employees of the CITY

24   CAPITAL AFFILIATED COMPANIES and the public.

25       388.    The Individual Defendants participated in the sale of CITY CAPITAL

26   AFFILIATED COMPANIES' shares and investments to the public including Plaintiff Rucks and

27   the California Subclass Members at a time when each of them knew or should have known material

28   information about the CITY CAPITAL AFFILIATED COMPANIES gained from such

relationship which would have significantly affected the price at which the CITY CAPITAL AFFILIATED COMPANIES securities were sold.

389.    The Individual Defendants knew or should have known the material adverse information complained of herein was not available to Plaintiff Rucks and the California Subclass Members.   The Individual Defendants had no reason to believe that Plaintiff Rucks and the California Subclass Members were in possession of the adverse information.

390.    Plaintiff Rucks and the California Subclass Members would not have purchased CITY CAPITAL AFFILIATED COMPANIES' shares at the price they paid, if at all, if they had been aware that the price had been artificially and falsely inflated by Defendants' misrepresentations and omissions of material adverse information discussed herein.

391.    By reason of the foregoing, Defendants named herein violated section 25402 of the California Corporations Code, thereby entitling Plaintiff Rucks and the California Subclass Members to recover damages pursuant to section 25502 of the California Corporations Code.

**COUNT XVI**

**VIOLATION OF SECTION 25504 OF THE CALIFORNIA CORPORATIONS CODE**

(Against Individual Defendants Only)

392.    Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

393.    Plaintiff Rucks asserts this claim against all Defendants on behalf of himself and the California Subclass.

394.    The Individual Defendants act as controlling persons of the CITY CAPITAL AFFILIATED COMPANIES within the meaning of section 25504 of the California Corporations Code.

395.    By reason of such wrongful conduct in violation of California Corporations Code § 25401, the Individual Defendants are liable pursuant to section 25504 of the California Corporations Code.

396.    As a direct and proximate result of their wrongful conduct, Plaintiff Rucks and the

SNYDER ♦ DORENFELD, LLP

California Subclass Members suffered damage in connection with their purchase of CITY CAPITAL AFFILIATED COMPANIES' stock.

## COUNT XVII

### VIOLATION OF SECTIONS 1709-1719 OF THE CALIFORNIA CIVIL CODE

(Against all Defendants)

397.        Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

398.    Plaintiff Rucks asserts this claim against all Defendants on behalf of himself and the California Subclass.

399.    For the purpose of inducing Plaintiff Rucks and the California Subclass Members to purchase or otherwise acquire CITY CAPITAL AFFILIATED COMPANIES' securities, and with the intent to deceive such investors, Defendants, and each of them, employed a scheme and conspiracy to defraud as a part of which said Defendants made, participated in the making of, or aided and abetted the making of the misrepresentations of fact as set forth above.   Said misrepresentations and statements were not true when made and Defendants did not believe them to be true.  Said acts by Defendants were fraudulent, oppressive and malicious.

400.    Plaintiff Rucks and the California Subclass Members, individually, relied on one or more of the false statements and/or omissions alleged herein and were damaged thereby.

## COUNT XVIII

### VIOLATION OF THE CONSUMER FINANCIAL PROTECTION BUREAU'S

### REGULATIONS

*(15 U.S.C. § 78u, et seq.)*

(Against EQUITY TRUST )

401.    Plaintiffs incorporate the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

402.    Financial entities that engage in conduct that poses a risk to consumers as well as financial entities that engage in unfair, deceptive or abusive acts or practices are regulated by and

SNYDER ◆ DORENFELD, LLP

subject to enforcement actions from the Consumer Financial Protection Bureau ("CFPB"), which was created by the Dodd-Frank Act, 15 U.S.C. section 78u, *et seq.*

403.   EQUITY TRUST herein  materially interfered with  their customers' ability to understand a term or condition of a consumer financial product or service;  took unreasonable advantage of  their customers' lack of financial savvy; and precluded the customers' ability to protect themselves in the selection or use of consumer financial products or services.

404.   The aforementioned conduct by EQUITY TRUST constitutes unfair, deceptive and misleading practices by financial service firms within the meaning of the CFPB Rules.

405.   Plaintiffs and the Class Members have suffered damages as a proximate result of EQUITY TRUST's violation of the CFPB rules.

## COUNT XIX

### (ALTER EGO/VEIL PIERCING)

### (Against Defendants MACINTYRE, TAYLOR and LIPINSKI)

406.   Plaintiffs incorporate by reference all of the allegations of all prior paragraphs as though fully set forth herein.

407.   This Count XIX is asserted against MACINTYRE, TAYLOR and LIPINSKI by Plaintiffs individually and on behalf of the Class.

408.   MACINTYRE, TAYLOR and LIPINSKI are liable for the conduct of CITY CAPITAL as set forth above under a theory of alter ego / veil piercing because they used the corporate form of CITY CAPITAL and the CITY CAPITAL AFFILIATED COMPANIES to accomplish fraudulent objects, namely, to fraudulently promote the sale of fraudulent investments in the CITY CAPITAL AFFILIATED COMPANIES and to conceal the proceeds of that fraud and frustrate the ability of victims to obtain redress for the fraud.

409.    MACINTYRE, TAYLOR and LIPINSKI have used CITY CAPITAL's corporate form to conceal their profits and income derived from the CITY CAPITAL AFFILIATED COMPANIES' Ponzi Schemes and fraudulent investment schemes.  TAYLOR is the founding shareholder of CITY CAPITAL and became the CEO of CITY CAPITAL in May of 2006.  He has used CITY CAPITAL to perpetuate numerous Ponzi schemes and fraudulent investment schemes

SNYDER ◆ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1  in violation of applicable SEC and state securities regulations in at least 43 states. MACINTYRE

2  and LIPINSKI, from October of 2011 until at least May of 2012 controlled the operations of the

3  CITY CAPITAL AFFILIATED COMPANIES and perpetuated the fraudulent schemes of the

4  CITY CAPITAL CONSPIRATORS.

5  410.    CITY CAPITAL is severely undercapitalized and has been since inception. The

6  SEC filings of CITY CAPITAL demonstrate that CITY CAPITAL has never been profitable and

7  has maintained a negative balance sheet since May of 2006. CITY CAPITAL has no significant

8  assets, no insurance coverage and no reserve for potential liabilities and is delinquent in filing

9  mandated disclosures with the SEC, certain state regulatory agencies and has failed to file

10  corporate tax returns with the IRS and certain state agencies.

11  411.    CITY CAPITAL does not follow the required corporate formalities. CITY

12  CAPITAL has consistently failed to: adopt corporate by-laws; hold regular meetings of the board

13  of directors; file SEC disclosure documents required to be filed by publicly-traded companies;

14  comply with the requirements of Sarbanes-Oxley in reporting its financial results and disclosures;

15  issue stock certificates to its shareholders; properly document, obtain necessary shareholder

16  approval and disclose the issuance of   "loans" to the CITY CAPITAL AFFILIATED

17  COMPANIES and the CITY CAPITAL CONSPIRATORS with no prospects for repayment; and

18  elect and remove officers and directors of CITY CAPITAL without a required vote of the

19  shareholders.

20  412.    TAYLOR, MACINTYRE and LIPINSKI have caused the unauthorized diversion of

21  corporate funds and/or assets to other corporate uses or their own personal use and/or have treated

22  the assets of CITY CAPITAL as their own as set forth herein.

23  413.    CITY CAPITAL, ERX and the remaining CITY CAPITAL AFFILIATED

24  COMPANIES continue to operate at a loss and apparently are on the verge of bankruptcy.

25  414.    In light of their domination of CITY CAPITAL, there is such a unity of interest and

26  ownership between CITY CAPITAL and TAYLOR, MACINTYRE and LIPINSKI that their

27  separate personalities no longer exist. Moreover, failure to disregard the corporate entity would

28  sanction fraud and promote injustice in these circumstances since the individual defendants will

1  have absconded with the proceeds of the fraud, having left CITY CAPITAL insolvent and unable
2  to satisfy any judgment that may be obtained in this action.

3                              **PRAYER FOR RELIEF**

4        WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, demand
5  upon Defendants jointly and severally for:

6        1.      An order certifying the case as a class action;

7        2.      An order appointing Plaintiffs as the Class Representatives of the Class;

8        3.      An order appointing undersigned counsel and their firms as counsel for the Class;

9        4.      Compensatory and punitive damages, restitution, disgorgement of profits and
10 statutory penalties;

11       5.      Injunctive relief;

12       7.      An order that a constructive trust be imposed over all monies in Defendants'
13 possession which rightfully belong to Plaintiffs and/or an asset freeze of monies belonging to
14 Defendants, and attorney's fees under private Attorney General statutes;

15       9.      Pre and post-judgment interest as allowed by law;

16       10.     An award of attorneys' fees and costs; and

17       11.     Any and all such further relief as this Court deems just and proper.

18                              **DEMAND FOR JURY TRIAL**

19       Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury
20 as to all issues so triable as a matter of right.

21                                      Respectfully Submitted:

22 Dated: August 21, 2012             BURSOR & FISHER, P.A.

23                                     By: _____
24                                              L. Timothy Fisher

25                                     L. Timothy Fisher (State Bar No. 191626)
                                       1990 North California Blvd., Suite 940
26                                     Walnut Creek, CA 94596
                                       Telephone: (925) 300-4455
27                                     Facsimile:  (925) 407-2700
                                       Email: ltfisher@bursor.com
28

SNYDER ♦ DORENFELD, LLP

CLASS ACTION COMPLAINT                                                              67

SNYDER ♦ DORENFELD, LLP
David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone:  (818) 865-4000
Facsimile:   (818) 865-4010

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
7857 W. Sample Rd., Suite 140
Coral Springs, FL 33065
Telephone: (954) 663-5818
Facsimile:  (954) 341-3568


Attorneys for Plaintiffs